# United States Court of Appeals for the Federal Circuit

04-1107

CORUS STAAL BV and CORUS STEEL USA INC.,

Plaintiffs-Appellants,

v.

DEPARTMENT OF COMMERCE,

Defendant-Appellee,

and

UNITED STATES STEEL CORPORATION,

Defendant-Appellee,

and

NATIONAL STEEL CORPORATION, BETHLEHEM STEEL CORPORATION,
STEEL DYNAMICS, INC., IPSCO STEEL INC.,
GALLATIN STEEL COMPANY, and NUCOR CORPORATION,

Defendants.

Richard O. Cunningham, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were Joel D. Kaufman, Alice A. Kipel, Gregory S. McCue and Evangeline D. Keenan.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee, Department of Commerce. With him on the brief were Peter D. Keisler, Assistant Attorney General; Jeanne E. Davidson, Deputy Director, and Paul D. Kovac, Trial Attorney. Of counsel on the brief were John D. McInerney, Chief Counsel, Mark A. Barnett, Senior Counsel, Elizabeth C. Seastrum, Senior Counsel, Ann Talbot, Senior Attorney, and Barbara J. Tsai, Attorney-Advisor, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC. Of counsel were Claudia Burke and William J. Kovatch, Jr., Attorneys.

Ellen J. Schneider, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for defendant-appellee, United States Steel Corporation. With her on the

brief were <u>Robert E. Lighthizer</u>, <u>John J. Mangan</u> and <u>Jeffrey D. Gerrish</u>.  Of counsel were <u>James C. Hecht</u> and <u>Daniel L. Schneiderman</u>.

Appealed from:     United States Court of International Trade

Chief Judge Jane A. Restani

# United States Court of Appeals for the Federal Circuit

04-1107

CORUS STAAL BV and CORUS STEEL USA INC.,

Plaintiffs-Appellants,

v.

DEPARTMENT OF COMMERCE,

Defendant-Appellee,

and

UNITED STATES STEEL CORPORATION,

Defendant-Appellee,

and

NATIONAL STEEL CORPORATION, BETHLEHEM STEEL CORPORATION,
STEEL DYNAMICS, INC., IPSCO STEEL INC.,
GALLATIN STEEL COMPANY, and NUCOR CORPORATION,

Defendants.

_____

DECIDED:   January 21, 2005
_____


Before MAYER, Circuit Judge*, PLAGER, Senior Circuit Judge, and PROST, Circuit Judge.

MAYER, Circuit Judge.

━━━━━━━━━━━━━━━━

\*    Haldane Robert Mayer vacated the position of Chief Judge on December 24, 2004.

Corus Staal BV and Corus Steel USA Inc. (collectively "Corus") appeal the judgment of the Court of International Trade, Corus Staal BV v. Dep't of Commerce, 283 F. Supp. 2d 1357 (Ct. Int'l Trade 2003), affirming the Department of Commerce's ("Commerce's") zeroing methodology to calculate the weighted-average dumping margin for imports of Corus' hot-rolled carbon steel flat products ("hot-rolled steel") from the Netherlands. We affirm.

Background

On December 4, 2000, Commerce initiated an antidumping duty investigation of alleged less-than-fair-value sales of hot-rolled steel from the Netherlands and several other foreign producers during the period of October 1, 1999, through September 30, 2000. Notice of Initiation of Antidumping Duty Investigations: Certain Hot-Rolled Carbon Steel Flat Products From Argentina, India, Indonesia, Kazakhstan, the Netherlands, The People's Republic of China, Romania, South Africa, Taiwan, Thailand, and Ukraine, 65 Fed. Reg. 77,568 (Dec. 12, 2000). Based on its review, Commerce calculated a preliminary weighted-average dumping margin for Corus of 2.44 percent. Notice of Preliminary Determination of Sales at Less Than Fair Value; Certain Hot-Rolled Carbon Steel Flat Products From the Netherlands, 66 Fed. Reg. 22,146 (May 3, 2001) ("Preliminary Notice"). Commerce issued a final determination of less-than-fair-value sales in Certain Hot-Rolled Carbon Steel Flat Products From the Netherlands, 66 Fed. Reg. 50,408 (Oct. 3, 2001), as amended by 66 Fed. Reg. 55,637 (Nov. 2, 2001) ("Final Determination"), in which it revised the weighted-average dumping margin to 2.59.

Commerce's methodology for calculating the weighted-average dumping margin was controlled by 19 U.S.C. § 1677(35). First, it calculated the "dumping margin" for individual U.S. transactions, which is "the amount by which the normal value exceeds the . . . constructed export price[1] of the subject merchandise." Id. § 1677(35)(A). Next, Commerce calculated the weighted-average dumping margin "by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate . . . constructed export prices of such exporter or producer." Id. § 1677(35)(B). Commerce used a methodology called "zeroing" in this second step whereby only positive dumping margins (i.e., margins for sales of merchandise sold at dumped prices) were aggregated, and negative margins (i.e., margins for sales of merchandise sold at nondumped prices) were given a value of zero.

Corus appealed the final determination to the Court of International Trade challenging, inter alia, Commerce's zeroing methodology. It argued that the use of zeroing is an unreasonable interpretation of the statute, resulting in a fundamentally unfair comparison that ignores certain transactions (i.e., nondumped sales), and a distorted final margin. The court affirmed Commerce's methodology under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984), concluding that: (1) sections 1677(35)(A) & (B) neither require nor prohibit Commerce from considering nondumped sales; and (2) zeroing was a reasonable interpretation of the

---

[1]    Normal value ("NV") is the price Corus charged for hot-rolled steel in the Dutch home market. Constructed export price ("CEP") is the price Corus charged for hot-rolled steel in the United States. See Koyo Seiko Co. v. United States, 258 F.3d 1340, 1342 (Fed. Cir. 2001). Commerce viewed all Corus transactions as CEP. Preliminary Notice, 66 Fed. Reg. at 22,148. Commerce uses CEP if, before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter. 19 U.S.C. § 1677a(b) (2000).

statute. <u>Corus Staal BV v. Dep't of Commerce</u>, 259 F. Supp. 2d 1253, 1261-63 (Ct. Int'l Trade 2003). The case was remanded for reasons not pertinent to this appeal, and final judgment was entered in <u>Corus Staal BV v. Department of Commerce</u>, 283 F. Supp. 2d 1357 (Ct. Int'l Trade 2003). Corus appeals and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

Discussion

We review the grant of judgment on the agency record by the Court of International Trade without deference. <u>PPG Indus., Inc. v. United States</u>, 978 F.2d 1232, 1236 (Fed. Cir. 1992). We apply anew the same standard used by the trial court, <u>Micron Tech., Inc. v. United States</u>, 243 F.3d 1301, 1307-08 (Fed. Cir. 2001), and will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law," 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). We apply a two-part inquiry to determine whether to sustain Commerce's interpretation of 19 U.S.C. § 1677(35)(A)-(B). <u>See</u> <u>Chevron</u>, 467 U.S. at 842-43. First, we determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Id.</u> "[I]f the statute is silent or ambiguous with respect to the specific issue," however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." <u>Id.</u> at 843. In recognition of Commerce's expertise in the field of antidumping investigations, we accord deference to its statutory interpretation in the presence of ambiguity. <u>See</u> <u>Pesquera Mares Australes Ltda. v. United States</u>, 266 F.3d 1372, 1382 (Fed. Cir. 2001).

Corus challenges the court's finding that Commerce's interpretation of section 1677(35) is reasonable, arguing that: (1) zeroing is inconsistent with the unambiguous statutory scheme for administrative investigations, making that practice both unlawful and unreasonable; and (2) Commerce's zeroing methodology violates the United States' obligation to interpret section 1677(35) to conform to World Trade Organization ("WTO") decisions prohibiting zeroing. Because zeroing is in fact permissible in administrative investigations and because Commerce is not obligated to incorporate WTO procedures into its interpretation of U.S. law, Corus' arguments fail.

I.

Corus primarily argues that section 1677(35) requires Commerce to base its final determination on weighted-average dumping margins that include all prices for all of the merchandise under investigation, not merely the prices of transactions that yield positive dumping margins. They allege that, had zeroing not been used, its weighted-average dumping margin would have been -4.7 percent, thereby avoiding the antidumping duty.

In essence, Corus urges us to draw a distinction in the application of section 1677(35) as between administrative investigations and administrative reviews. Such a distinction is necessary in order for Corus to avoid Timken Co. v. United States, 354 F.3d 1334 (Fed. Cir. 2004), where we upheld Commerce's section 1677(35) zeroing methodology in administrative reviews under Chevron's second prong. The distinction Corus alleges cannot be found on the face of section 1677(35) itself, but in the

underlying statutes defining investigations[2] and reviews.[3] Specifically, Corus argues that the reference in section 1677f-1(d)(1)(A)(i) to "weighted average" unambiguously contemplates the use of all subject merchandise in administrative investigations to calculate the weighted average, as opposed to section 1675(a)(2)(A)'s calculation of individual dumping margins for each export transaction in administrative reviews. As such, their argument continues, Chevron is inapplicable and Commerce's practice should not stand.

We agree that a distinction exists between administrative investigations and reviews. The true distinction, however, is not as alleged by Corus, and does not have the effect of making Timken inapposite. It is true that the comparisons between U.S. price (here, CEP) and NV differ between investigations and reviews, but they differ because investigations compare average U.S. price to average NV, while reviews compare U.S. price to monthly average NV on an entry-by-entry basis. Further, this distinction is subsumed under Commerce's methodology: the result of the comparison of NV and CEP, whether in the context of investigations or reviews, falls under section 1677(35)(A) (the first step of the methodology) and is then aggregated under section

---

[2]    19 U.S.C. § 1677f-1(d)(1)(A)-(d)(1)(A)(i) (2000). In relevant part, the statute states:

> In an investigation . . . the administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value . . . by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise . . . .

[3]    19 U.S.C. § 1675(a)(2)(A) (2000). In relevant part, the statute states:

> For the purpose of [administrative review of any antidumping duty], the administering authority shall determine . . . the normal value and export price (or constructed export price) of each entry of the subject merchandise, and . . . the dumping margin for each such entry.

1677(35)(B) (the second step). Our decision in <u>Timken</u> addressed Commerce's interpretation of section 1677(35); it is of no consequence that it was decided in the context of a review. Therefore, <u>Timken</u> governs, and the Court of International Trade was correct to find Commerce's zeroing methodology permissible in the context of administrative investigations.

II.

Corus alternatively argues that Commerce unreasonably refused to interpret the statute in a manner consistent with U.S. international obligations under the <u>Charming Betsy</u> doctrine of claim construction, which states that courts should interpret U.S. law, whenever possible, in a manner consistent with international obligations. <u>Murray v. The Schooner Charming Betsy</u>, 6 U.S. (2 Cranch) 64, 118 (1804). Corus asserts that, by disregarding the prices of certain U.S. transactions that are made at nondumped prices, Commerce violated its obligation under Article 2.4.2 of the Agreement on the Implementation of Article VI of the General Agreement on Tariffs and Trade ("Antidumping Agreement" or "ADA")[4] to fairly consider all comparable export transactions. This "fair comparison" argument is the same argument offered by the appellant in <u>Timken</u>. In that case, we held that the appellant's invocation of the ADA's

---

[4]   Agreement on Implementation of Article VI of GATT art. 2.4.2 (Apr. 15, 1994), <u>reprinted</u> <u>in</u> H.R. Doc. No. 103-316, vol. 1, at 1455 (1994). Article 2.4.2 states in pertinent part:

> Subject to the provisions governing <u>fair comparison</u> . . . the existence of margins of dumping during the investigation phase shall normally be established on the basis of a comparison of a weighted average normal value with a weighted average of prices of <u>all</u> comparable export transactions or by a comparison of normal value and export prices on a transaction-to-transaction basis.

(Emphases added.)

"fair comparison" language was misplaced because section 1677b(a)'s[5] fair comparison language and explicit scheme for calculating NV governed. 354 F.3d at 1344. Because "[section] 1677b(a) does not impose any requirements for calculating normal value beyond those explicitly established in the statute and does not carry over to create additional limitations on the calculation of dumping margins," id., we likewise dismiss Corus' invocation of the "fair comparison" language.

Corus further claims that Commerce violated the ADA by failing to discontinue its zeroing methodology in light of WTO Appellate Body interpretations in European Communities—Antidumping Duties on Imports of Cotton-Type Bed Linen from India, WT/DS141/AB/R (Mar. 1, 2001) ("EC-Bed Linen"), United States—Sunset Review of Antidumping Duties on Corrosion-Resistant Carbon Steel Flat Products from Japan, WT/DS244/AB/R (Dec. 15, 2003) ("Corrosion-Resistant Steel"), and United States— Final Dumping Determination on Softwood Lumber from Canada, WT/DS264/AB/R (Aug. 11, 2004) ("Softwood Lumber"). In EC-Bed Linen, a case in which the United States was not a party, the Appellate Body determined that the EC practice of zeroing during an antidumping investigation was inconsistent with Article 2.4.2 of the ADA. WT/DS141/AB/R ¶ 66. In Corrosion-Resistant Steel, the Appellate Body hypothesized (without finding) that Commerce had used zeroed margins from administrative reviews in its sunset review of antidumping orders on Japanese steel products, and suggested

---

[5]  In relevant part, the statute states:

>  In determining . . . whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value.

(Emphasis added.)

that any such use would violate the ADA. WT/DS244/AB/R ¶ 135. In Softwood Lumber, the Appellate Body found that Commerce violated Article 2.4.2 when it used zeroing to calculate the weighted-average dumping margin in its investigation of imports of Canadian softwood lumber. WT/DS264/AB/R ¶ 7.224.

WTO decisions are "not binding on the United States, much less this court." Timken, 354 F.3d at 1344. Further, "[n]o provision of any of the Uruguay Round Agreements [e.g., the ADA], nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect." 19 U.S.C. § 3512(a) (2000). Neither the GATT nor any enabling international agreement outlining compliance therewith (e.g., the ADA) trumps domestic legislation; if U.S. statutory provisions are inconsistent with the GATT or an enabling agreement, it is strictly a matter for Congress. See Suramerica de Aleaciones Laminads, C.A. v. United States, 966 F.2d 660, 668 (Fed. Cir. 1992); see also 19 U.S.C. § 2504(a) (2000) ("No provision of any trade agreement . . . nor the application of any such provision to any person or circumstance, which is in conflict with any statute of the United States shall be given effect under the laws of the United States."). Congress has enacted legislation to deal with the conflict presented here. It has authorized the United States Trade Representative, an arm of the Executive branch, in consultation with various congressional and executive bodies and agencies, to determine whether or not to implement WTO reports and determinations and, if so implemented, the extent of implementation. See 19 U.S.C. §§ 3533(f), 3538 (2000); see also 19 U.S.C. § 3533(g) (2000) (defining a statutory scheme that Commerce must observe in order to change its policy to conform to a WTO ruling).

We therefore accord no deference to the cited WTO cases. EC-Bed Linen is no more persuasive here than it was for the appellant in Timken, and we now reject it for the same reasons cited in that case. See Timken, 354 F.3d at 1344. Corrosion-Resistant Steel is nonbinding because the Appellate Body did not make a finding regarding Commerce's zeroing methodology. WT/DS244/AB/R ¶ 138. Finally, we reject Softwood Lumber as nonbinding because the finding therein was not adopted as per Congress's statutory scheme.

"[T]he conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government . . . ." United States v. Pink, 315 U.S. 203, 222-23 (1942). In this case, section 1677(35) presented Commerce with a choice as to how it calculates weighted-average dumping margins. We give Commerce substantial deference in its administration of the statute because of the foreign policy implications of a dumping determination. See Fed. Mogul Corp. v. United States, 63 F.3d 1572, 1582 (Fed. Cir. 1995). We will not attempt to perform duties that fall within the exclusive province of the political branches, and we therefore refuse to overturn Commerce's zeroing practice based on any ruling by the WTO or other international body unless and until such ruling has been adopted pursuant to the specified statutory scheme.

## Conclusion

Accordingly, the judgment of the Court of International Trade is affirmed.

## AFFIRMED