Slip Op. 09-129

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                  :
SEARING INDUSTRIES, SOUTHLAND     :
TUBE INC., AND WESTERN TUBE       :
CONDUIT CORPORATION,              :
                                  :
              Plaintiffs,         :   Before: Richard K. Eaton, Judge
                                  :
                                  :   Court No. 08-00278
         v.                       :
                                  :
                                  :
UNITED STATES,                    :
                                  :
              Defendant.          :
_____:
```

[The United States Department of Commerce's final results are sustained.]


Dated: November 6, 2009

*Schagrin Associates* (*Roger B. Schagrin* and *Michael J. Brown*), for plaintiffs.

*Tony West,* Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, *Claudia Burke*, Senior Trial Counsel, United States Department of Justice, Civil Division; Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Jonathan Zielinski*), of counsel, for defendant.


Eaton, Judge: This action is before the court on the USCIT Rule 56.2 motion for judgment on the agency record of plaintiffs Searing Industries, Southland Tube Inc., and Western Tube Conduit Corporation. By their motion, plaintiffs challenge the final results of the United States Department of Commerce's ("Commerce"

or the "Department") antidumping investigation of Nexteel, Co., Ltd. ("Nexteel") for the period of investigation April 1, 2006 through March 31, 2007.  *See* Light-Walled Rectangular Pipe and Tube from the Republic of Korea, 73 Fed. Reg. 35,655 (Dep't of Commerce June 24, 2008) (notice of final determination of sales at less than fair value) and the accompanying Issues and Decision Memorandum (Dep't of Commerce June 13, 2008) ("Issues & Dec. Mem."); Light-Walled Rectangular Pipe and Tube from Mex., the People's Republic of China, and the Republic of Korea, 73 Fed. Reg. 45,403 (Dep't of Commerce Aug. 5, 2008) (antidumping duty orders and notice of amended final determination of sales at less than fair value) (collectively, "Final Results").

In particular, plaintiffs contest Commerce's methodology of offsetting positive dumping margins with negative dumping margins in calculating the weighted-average dumping margin applicable to imports of light-walled rectangular pipe and tube from Korea. Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2006), and  19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).  For the reasons set forth below, Commerce's Final Results are sustained.

BACKGROUND

Plaintiffs are domestic manufacturers of pipe and tube who petitioned Commerce in June 2007, "alleg[ing] that imports of light-walled rectangular pipe and tube from Korea, Mexico, Turkey, and the [People's Republic of China], are being, or are likely to be, sold in the United States at less than fair value, . . . and that such imports are materially injuring, or threatening material injury" to the domestic industry. Light-Walled Rectangular Pipe and Tube from the Republic of Korea, Mex., Turkey, and the People's Republic of China, 72 Fed. Reg. 40,274, 40,275 (Dep't of Commerce July 24, 2007) (initiation of antidumping duty investigation). In July 2007, Commerce initiated an antidumping investigation in response to plaintiffs' petition. *See id.*

In June 2008, Commerce issued a final affirmative determination with respect to sales at less than fair value of light-walled rectangular pipe and tube from the Republic of Korea. *See* Light-Walled Rectangular Pipe and Tube from the Rep. of Korea, 73 Fed. Reg. 35,655 (Dep't of Commerce June 24, 2008) (notice of final determination of sales at less than fair value). Commerce initially calculated a 1.30 percent *de minimus* antidumping duty rate for imports from Nexteel, a Korean producer

of light-walled rectangular pipe and tube; the rate was later
reduced to 0.92 percent.  *See* Light-Walled Rectangular Pipe and
Tube from Mex., the People's Republic of China, and the Republic
of Korea, 73 Fed. Reg. 45,403, 45,404 (Dep't of Commerce Aug. 5,
2008) (antidumping duty orders and notice of amended final
determination of sales at less than fair value).  As a result,
although Commerce found that Nexteel's merchandise was dumped,
because the antidumping duty rate was *de minimus*, it did not
issue an antidumping order.  *See, e.g.*, *USEC, Inc. v. United
States*, 31 CIT 1049, 1071, 498 F. Supp. 2d 1337, 1356 (2007).

STANDARD OF REVIEW

When reviewing Commerce's final antidumping determinations,
the court "shall hold unlawful any determination, finding, or
conclusion found . . . to be unsupported by substantial evidence
on the record, or otherwise not in accordance with law . . . ."
19 U.S.C. § 1516a(b)(1)(B)(i).

DISCUSSION

The antidumping laws are designed to "level the playing
field" between imported and domestically-produced goods by
imposing increased duties on foreign-produced goods that are sold

in the United States at less than fair value.[1]  *U.S. Steel Corp.
v. United States*, 33 CIT __, __, Slip Op. 09-74 at 4 (July 20,
2009) ("*U.S. Steel*").  Calculating the weighed-average dumping
margin[2] plays a significant role in the application of these laws
because it is determinative of the deposit rate[3] to be paid on
the importation of merchandise.

In an antidumping investigation, Commerce generally may
determine whether the subject merchandise is being sold at less
than fair value through one of two methods.  19 U.S.C. § 1677f-

---

[1]     To determine if goods are sold at less than fair value,
Commerce must first calculate the dumping margin: "the amount by
which the normal value exceeds the export price or constructed
export price of the subject merchandise."  19 U.S.C.
§ 1677(35)(A).  If the price of a good in the home market (normal
value) is higher than the price for the same good in the United
States (export price), then the dumping margin comparison
produces a positive number that indicates dumping has occurred.
On the other hand, when the price charged for the subject
merchandise in the United States is greater than that charged for
the same merchandise in the home market, the dumping margin
calculation yields a negative value, thus indicating that dumping
has not occurred.

[2]     The weighted-average dumping margin is "the percentage
determined by dividing the aggregate dumping margins determined
for a specific exporter or producer by the aggregate export
prices and constructed export prices of such exporter or
producer."  19 U.S.C. § 1677(35)(B).

[3]     Upon a preliminary determination of dumping, Commerce orders
the posting of a cash deposit or bond in an "amount based on the
estimated weighted average dumping margin . . . ."  19 U.S.C.
§ 1673b(d)(1)(A)(ii); *see NSK Ltd. v. United States*, 27 CIT 56,
105, 245 F. Supp. 2d 1335, 1375 (2003).

1(d).  Commerce may compare a weighted-average of normal values[4]
to a weighted-average of the export or constructed export prices
of comparable merchandise, or it may compare the normal values of
individual transactions to the export prices or constructed
export prices of individual transactions for comparable
merchandise.  19 U.S.C. § 1677f-1(d)(1)(A)(i)-(ii).  When
Commerce applies the first, or average-to-average, methodology
during an investigation, it usually divides the export
transactions into groups by model and level of trade.  19 C.F.R.
§ 351.414(d)(2) (2008).  Commerce then compares an average of the
export prices or constructed export prices of the transactions
within one averaging group to the weighted-average of normal
values of such sales.  19 C.F.R. § 351.414(d)(1).

For many years, Commerce's methodology for calculating
weighted-average dumping margins employed the "zeroing" of
negative dumping margins.  *Corus Staal BV v. Dep't of Commerce*,

---

[4]     As found in 19 U.S.C. § 1677b(a)(1)(B)(i), normal value or
home market value is defined as

> the price at which the foreign like product
> is first sold (or, in the absence of a sale,
> offered for sale) for consumption in the
> exporting country, in the usual commercial
> quantities and in the ordinary course of
> trade and, to the extent practicable, at the
> same level of trade as the export price or
> constructed export price . . . .

395 F.3d 1343, 1345 (Fed. Cir. 2005) ("*Corus Staal I*").  That is,

when aggregating the results of the averaging groups in order to

determine the weighted-average dumping margin, Commerce decreased

to zero any weighted-average export price or constructed export

price that exceeded the normal value.  Antidumping Proceedings:

Calculation of Weighted-Average Dumping Margin During an Admin.

Investigation*, 71 Fed. Reg. 77,722, 77,722 (Dep't of Commerce

Dec. 27, 2006).  Thus, any positive result was not used to offset

the results of averaging groups for which the weighted-average

export price or constructed export price was less than the

weighted-average normal value.  Essentially, this practice meant

that only sales at less than fair value were included in the

final calculation of the weighted-average dumping margin.

In October 2005, a World Trade Organization ("WTO") dispute

settlement panel determined that Commerce's "denial of offsets

when using the average-to-average comparison methodology in

certain antidumping investigations . . . was inconsistent with

Article 2.4.2 of the Antidumping Agreement[5]."  *See id.* (citing

---

[5]      The Uruguay Round Agreements Act, Pub.L. No. 103-465, § 224,
108 Stat. 4809, 4878-86 (1994), "implemented the Agreement on
Implementation of Article VI of the General Agreement on Tariffs
and Trade 1994 ('Antidumping Agreement')."  *Thai I-Mei Frozen
Foods Co., Ltd. v. United States*, 32 CIT __, __, 572 F. Supp. 2d
1353, 1361 (2008) (citation omitted).

Panel Report, *United States-Laws, Regulations and Methodology for Calculating Dumping Margins*, WT/DS294/R (Oct. 31, 2005)).

Thereafter, on March 6, 2006, the Department published in the Federal Register a notice that it intended to cease zeroing negative margins in investigations and instead to provide offsets for non-dumped comparisons in order to comply with the WTO panel's findings. Antidumping Proceedings: Calculation of the Weighted Average Dumping Margin During an Antidumping Duty Investigation, 71 Fed. Reg. 11,189, 11,189 (Dep't of Commerce March 6, 2006). After soliciting rebuttal comments, Commerce finalized its new methodology by publishing notice that it would "no longer make average-to-average comparisons in investigations without providing offsets for non-dumped comparisons." Antidumping Proceedings: Calculation of Weighted-Average Dumping Margin During an Admin. Investigation, 71 Fed. Reg. 77,722, 77,722 (Dep't of Commerce Dec. 27, 2006). Thus, Commerce gave notice that it would cease zeroing negative dumping margins in investigations and stated that in the future it would subtract negative dumping margins from positive dumping margins in calculating weighted-average dumping margins. In so doing,

Commerce followed the statutory procedures[6] by which a WTO report

may be implemented into domestic law.  *See* 19 U.S.C. § 3533(g).

Plaintiffs raise three related issues in challenging

Commerce's offsetting methodology.  First, they contend that

Commerce's incorporation of negative dumping margins into its

calculation of Nexteel's weighted-average dumping margin

conflicts with the plain meaning of 19 U.S.C. § 1677(35)(A).

Plaintiffs' Br. Supp. Mot. J. Agency R. ("Plaintiffs' Br.") 7.

Second, plaintiffs maintain that the plain meaning of the statute

requires zeroing or exclusion of negative margins in both

_____

[6]     Commerce followed the procedure laid out in Section 123 of
the Uruguay Rounds Agreements Act to implement an adverse
decision from the World Trade Organization into domestic law.
Section 123 establishes procedures for amending, rescinding, or
modifying "an agency regulation or practice that is found to be
inconsistent [by a WTO Dispute Settlement Panel or Appellate
Body] with any of the Uruguay Round Agreements."  *U.S. Steel*,
Slip Op. 09-74 at 6 (citing 19 U.S.C. § 3533(g)).  The
appropriate Congressional committees named in Section 123(f) must
be consulted.  19 U.S.C. § 3533(g)(1)(A).  The Trade
Representative must seek advice regarding the modification from
relevant private sector advisory committees and "submit[] . . . a
report describing the proposed modification, the reasons for the
modification, and a summary of the advice obtained . . . ."  19
U.S.C. § 3533(g)(1)(B), (D).  The agency must "publish[] in the
Federal Register the proposed modification and the explanation
for the modification" to provide an opportunity for public
comment.  *Id.* at § 3533(g)(1)(C).  "[T]he Trade Representative
and the head of the relevant department or agency [must] have
consulted with the appropriate congressional committees on the
proposed contents of the final rule or other modification."  19
U.S.C. 3533(g)(1)(E).  "[T]he final rule or other modification
[must be] published in the Federal Register."  19 U.S.C.
3533(g)(1)(F).

investigations and reviews.  Plaintiffs' Br. 20.  Third,

plaintiffs insist that Commerce's efforts to bring its

investigation methodology into conformity with the WTO panel's

decision violated United States law because the plain meaning of

the statute requires Commerce to disregard positive margins.

Plaintiffs' Br. 6.


   A. Legal Framework for Dumping Margins

     Plaintiffs' primary claim is that the plain meaning of 19

U.S.C. § 1677(35)(A) precludes the inclusion in weighted-average

dumping margin calculations of any dumping margins where the

normal value is less than the export price.  Plaintiffs' Br. 7.

     As noted, in accordance with the unfair trade laws, Commerce

makes its less than fair value determinations by calculating the

dumping margin, or "the amount by which the normal value exceeds

the export price or constructed export price of the subject

merchandise."  19 U.S.C. § 1677(35)(A).  Here, in calculating the

weighted-average dumping margin for Nexteel, Commerce used its

offsetting methodology and thus subtracted negative dumping

margins from positive margins.  Issues & Dec. Mem. 10.

Plaintiffs argue that Commerce was prohibited from using its

offset methodology because the word "exceeds," as used in 19

U.S.C. § 1677(35)(A), unambiguously requires that only sales at less than fair value be used in calculating the weighted-average dumping margin.  *See* Plaintiffs' Br. 10 ("The result of a comparison between the [normal value] and [export price] where the [normal value] is <u>less than</u> the [export price] does <u>not</u> comport with the statutorily established condition for a dumping margin . . . .").

Because the issue raised by plaintiffs has been thoroughly examined by both the Federal Circuit and this Court, an exhaustive discussion is unnecessary.  First, plaintiffs' contention that 19 U.S.C. § 1677(35)(A) only contemplates a calculation methodology that excludes negative dumping margins has been addressed by the Federal Circuit.  *See, e.g.*, *Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004) ("*Timken*"); *Corus Staal I*, 395 F.3d at 1343.

Although plaintiffs attempt to distinguish the two cases, *Timken* and *Corus Staal I* direct the outcome here.  Each case relied on the rules of statutory construction set out in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*"), to find that Commerce's former zeroing methodology was a permissible construction of 19 U.S.C.

§ 1677(35)(A). Using *Chevron*'s[7] first step, each case examined 19 U.S.C. § 1677(35)(A) and found, in the context of unfair trade laws, the word "exceeds" to be ambiguous and the statute overall to "not directly speak to the issue" of whether only positive dumping margins might be included in weighted-average dumping margin calculations. *Timken*, 354 F.3d at 1342. Then, using *Chevron*'s second step, the Federal Circuit considered whether Commerce made a "reasonable choice within a gap left open by Congress." *Chevron*, 467 U.S. at 866.

In *Timken*, the Federal Circuit upheld Commerce's zeroing methodology in administrative reviews under *Chevron's* second step. In doing so, the Court first found that 19 U.S.C. § 1677(35)(A) "does not unambiguously require that dumping margins be positive numbers," and then found that "Commerce based its zeroing practice on a reasonable interpretation of the statute." *Timken*, 354 F.3d at 1342. Importantly for the case

---

[7] In accordance with *Chevron*, a court must undertake a two-part analysis when reviewing an agency's construction of the statute. First, a court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If Congress has not addressed the question at issue and the statute is "silent or ambiguous," the court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

now before the court, however, the *Timken* Court found the statute had not spoken directly on the zeroing question, and thus going to the second *Chevron* step was required. Although plaintiffs argue otherwise, it is apparent that the Federal Circuit found ambiguity in 19 U.S.C § 1677(35)(A).

In *Corus Staal I*, the Federal Circuit reiterated its holding that, because 19 U.S.C § 1677(35)(A) was ambiguous, the second step of *Chevron* applied and the test was whether Commerce's interpretation was reasonable. In its holding, the *Corus Staal I* Court found zeroing reasonable in the context of investigations. It is again significant, however, that the Court concluded that the statute remained ambiguous in the context of an investigation and therefore, found zeroing also "permissible in the context of administrative investigations." *Corus Staal I*, 395 F.3d at 1347. When *Timken* and *Corus Staal I* are read together, it is apparent that the Federal Circuit has found § 1677(35)(A) to be ambiguous both in the context of investigations and administrative reviews. It is equally apparent, however, that neither case found that zeroing is unambiguously *required* by the statute.

Now that Commerce has abandoned zeroing in investigations, the question becomes whether Commerce's new offsetting methodology is reasonable under *Chevron*'s second step in the

context of investigations.  Whenever Congress has "explicitly

left a gap for the agency to fill," the agency's regulation is

"given controlling weight unless [it is] arbitrary, capricious,

or manifestly contrary to the statute."  *Chevron*, 467 U.S. at

843-44.  "To survive judicial scrutiny, [Commerce's] construction

need not be the *only* reasonable interpretation or even the *most*

reasonable interpretation."  *Koyo Seiko Co. v. United States*, 36

F.3d 1565, 1570 (Fed. Cir. 1994) (citing *Zenith Radio Corp. v.*

*United States*, 437 U.S. 443, 450 (1978)).

Recently, this Court addressed this question, and found

that, "[b]ecause the cited provisions do not directly speak to

the issue of positive and negative value dumping margins, the

second step of *Chevron* requires that the court evaluate whether

Commerce's interpretation is based on a permissible construction

of the statutes at issue."  *U.S. Steel,* 33 CIT __, __, Slip Op.

09-74 at 18.  The Court reached this conclusion based on its

reading of *Timken* and *Corus Staal I*.  *See id.* at 16 ("The court

is bound by the Federal Circuit's reading of these provisions in

*Timken*, which found that Congress's definition of 'dumping

margin' is unclear as to whether the positive and negative value

dumping margins fit within the description of that term.  *See*

*Timken*, 354 F.3d at 1341-43.  The Federal Circuit held that

neither the 'fair comparison' phrase in § 1677b(a), nor the

'exceeds' language in § 1677(35)(A), requires that Commerce

consider only those dumping margins that yield a positive value

as satisfying the statutory definition of the term 'dumping

margin.'  *See id.*  The Federal Circuit in *Corus* [*Staal*] *I* also

made clear that the formula described in § 1677(35)(B) does not

limit Commerce as to the specific values that it must consider

when calculating the weighted-average dumping margin.  *See* 395

F.3d at 1346-47.").

     After concluding that *Timken* and *Corus Staal I* controlled,

the *U.S. Steel* Court continued by noting that the Federal

Circuit's overriding lesson in *Timken* was that

> Congress, in crafting the statutory
> definitions of 'dumping margin' and
> 'weighted-average dumping margin,' did not
> address whether Commerce must (1) employ a
> certain methodology to calculate the dumping
> margins for the subject merchandise, and (2)
> consider only certain values – positive,
> negative, or both – as a 'dumping margin'
> when calculating the weighted-average dumping
> margin.

*U.S. Steel*, 33 CIT __, __, Slip Op. 09-74 at 16-17.  Based on the

Federal Circuit's holding in *Timken*, the *U.S. Steel* Court found

that "the statutory text does not unambiguously compel the court

to find that Commerce's use of offsetting is prohibited."  *Id*. at

17.

Moving to the second step of *Chevron*, the *U.S. Steel* Court found that Commerce's new methodology was a reasonable construction of 19 U.S.C § 1677(35)(A). The Court thoroughly analyzed several factors indicating reasonableness, including: the deference owed to Commerce and the Executive Branch ("deference accorded to Commerce's interpretation is at its highest when that agency acts under the authority of a Congressional mandate to harmonize U.S. practices with international obligations"); the changing of the policy within the framework set out by Congress ("result of . . . a careful balancing act"); the full compliance with proper procedures to make the change ("followed the agency's regular practice and procedure in so doing"); the tacit approval by Congress of the change ("Congress had the opportunity to indicate its disagreement with Commerce's adoption of the new rule"); the central purpose of the antidumping laws ("Commerce does not offend the central aim of the antidumping laws"); the more complete view of the market the new methodology allows ("[i]n using the new methodology, Commerce must consider all sales in certain investigations"); and the effect of the change on other statutory sections ("Commerce's reading of the term . . . does not render [other statutory sections] meaningless"). *Id.* at 18-

24; *see also id.* at 26 ("For the reasons explained herein, the Section 123 Determination is in accord with law and is reasonable. Accordingly, . . . the court . . . therefore affords Commerce's reasonable reading of § 1677(35)(A)-(B) the deference it is due under *Chevron*.") (citations omitted).

Taken together, these cases all lead to the conclusion that Commerce reasonably interpreted an ambiguous statute. Based on the holdings in *Timken* and *Corus Staal I* and the analysis in *U.S. Steel*, the court finds that Commerce's methodology of offsetting positive dumping margins with negative dumping margins in calculating the weighted-average dumping margins is a permissible interpretation of 19 U.S.C. § 1677(35)(A).

B. Commerce's Application of Two Different Methodologies

Plaintiffs point out that the language of § 1677(35)(A) that the "normal value exceeds the export price" applies to both investigations and administrative reviews. Plaintiffs' Br. 20. As a result, their second claim is that "the statute's directive that the dumping margin under [§] 1677(35)(A) equals the amount that the normal value exceeds the export price applies with equal force to investigations as it does to reviews." Plaintiffs' Br. 25. Put another way, plaintiffs contend that a plain reading of

the statute requires that positive margins be disregarded in both investigations and reviews when constructing weighted-average margins.

The problem with plaintiffs' argument is that it presupposes that the plain meaning of § 1677(35)(A) unambiguously precludes Commerce's offset methodology. As established above, however, it does not. The statute is ambiguous and Commerce reasonably interpreted it to permit the offsetting of negative margins in average-to-average comparisons made in investigations.

Furthermore, the Federal Circuit has reviewed, and accepted, the use of different calculation methodologies for reviews and investigations. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1375 (Fed. Cir. 2007) ("*Corus Staal II*"). The plaintiff in that case asserted that Commerce's elimination of zeroing in investigations required it to also eliminate the practice in reviews. In other words, the argument was the reverse of the claim made here. The Federal Circuit found the *Corus Staal II* plaintiff's argument unconvincing, stating that the change in policy for investigations only had "no bearing on the present appeal" which involved a review. *Id.* at 1374. As a result, the Federal Circuit concluded that its "previous determination that Commerce's policy of zeroing is permissible under the statute

applies to the challenged administrative review," even though

zeroing had been abandoned for use in investigations. *Id.* at

1375.

Analyzing *Corus Staal II*, this Court recently observed in

*Union Steel v. United States* that

> the Court of Appeals in *Corus [Staal] II* made
> it amply clear that it did not consider
> Commerce's decision to discontinue zeroing
> when performing average-to-average
> comparisons in antidumping investigations
> while continuing zeroing in administrative
> reviews to be a sufficient basis to disturb
> its precedents, under which it had held
> zeroing to be permissible in administrative
> reviews based on the reasonableness of the
> Department's construction of 19 U.S.C. §
> 1677(35).

33 CIT __, __, Slip Op. 09-105 at 18 (Sept. 28, 2009). Put

another way, the Federal Circuit was fully aware that different

methodologies were being used in investigations and reviews, and

found no reason to conclude that the situation was unlawful.

This Court reached a similar conclusion in *Fujian Lianfu

Forestry Co. v. United States*. 33 CIT __, __, Slip Op. 09-81 at

51 (Aug. 10, 2009). In response to another challenge to the

continued use of zeroing in administrative reviews following its

elimination in investigations, the Court noted the "irony in

Commerce now adopting an interpretation of the statute that it

previously rejected[;]" however, the Court added that "such irony alone does not make Commerce's new approach unlawful." *Id.* Relying both on *Chevron*'s anticipation of administrative flexibility in handling ambiguous statutes and an acknowledgment that a statute may contain several permissible constructions in separate contexts, the *Fujian* Court accepted Commerce's use of different calculation methodologies for investigations and reviews. *Id.* Commerce had not "arbitrarily shifted its interpretation of the statute without reason," but rather "exercised its gap-filling authority to conform the administration of the dumping laws with U.S. international obligations." *Id.; see also Chevron,* 467 U.S. at 863-64 ("The fact that the agency has from time to time changed its interpretation of the term . . . does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. . . . [T]he fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute.").

Relying on these cases, the court rejects the plaintiffs' argument that the retention of zeroing in reviews requires its continued use in investigations.

C. Implementing WTO Panel Decisions

Plaintiffs' final contention is that "neither a WTO panel report nor Commerce's capitulation to the WTO trump" United States law concerning the calculations of weighted-average dumping margins. Plaintiffs' Br. 6. As with their previous arguments, plaintiffs' primary claim is that the statute unambiguously provides that only negative margins can be used to calculate the weighted-average dumping margin. As noted, however, § 1677(35)(A) simply does not require the use of zeroing and Commerce's offsetting methodology is a reasonable interpretation of the statute. Therefore, the court holds that plaintiffs are mistaken in their claim that the WTO ruling and United States law are in conflict.

CONCLUSION

Based on the foregoing, the court sustains as supported by substantial evidence and otherwise in accordance with law Commerce's use of offsetting negative dumping margins in calculating Nexteel's weighted-average dumping margin in its administrative investigation.  Therefore, plaintiffs' motion is denied.  Judgment shall be entered accordingly.


                                    /s/ Richard K. Eaton
                                    Richard K. Eaton

Dated: November 6, 2009
       New York, New York