# United States Court of Appeals
# for the Federal Circuit

---

**FEDMET RESOURCES CORPORATION,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

AND

**ANH REFRACTORIES COMPANY,**
*Defendant-Appellee,*

AND

**RESCO PRODUCTS, INC.** AND
**MAGNESITA REFRACTORIES COMPANY,**
*Defendants-Appellees.*

---

2013-1539

---

Appeal from the United States Court of International Trade in No. 12-CV-0215, Senior Judge Nicholas Tsoucalas.

---

Decided: June 20, 2014

---

R. WILL PLANERT, Morris Manning & Martin LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were DONALD B. CAMERON, JULIE C. MENDOZA, BRADY W. MILLS, and MARY S. HODGINS. Of counsel was SARAH SUZANNE SPRINKLE.

ANTONIA RAMOS SOARES, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With her on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel on the brief was DEVIN S. SIKES, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, of Washington, DC.

JOSEPH W. DORN, King & Spalding LLP, of Washington, DC, argued for defendant-appellee ANH Refractories Company. With him on the brief was BRIAN E. MCGILL.

CAMELIA C. MAZARD, Doyle, Barlow & Mazard PLLC, of Washington, DC, for defendants-appellees Resco Products, Inc., et al.

_____

Before RADER,[*] REYNA, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* REYNA.

Dissenting opinion filed by *Circuit Judge* WALLACH.

REYNA, *Circuit Judge.*

Fedmet Resources Corporation ("Fedmet") appeals a final decision of the U.S. Court of International Trade

_____

[*]    Randall R. Rader vacated the position of Chief Judge on May 30, 2014.

("Trade Court") denying Fedmet's motion for judgment upon the agency record and affirming the Department of Commerce's final scope determination regarding antidumping and countervailing duty orders covering imports of certain magnesia carbon bricks ("MCBs") from China and Mexico. *Fedmet Res. Corp. v. United States*, 911 F. Supp. 2d 1348 (Ct. Int'l Trade 2013). For the reasons below, we *reverse* the Trade Court's decision and *remand* for further proceedings in accordance with this opinion.

BACKGROUND

I.   The Underlying Investigations

On July 29, 2009, Resco Products, Inc. ("Resco") filed a petition with the Department of Commerce ("Commerce") requesting initiation of antidumping and countervailing duty investigations on imports of certain MCBs from China and Mexico. MCBs are a type of refractory brick used to line ladles and furnaces employed in steelmaking and steel handling processes. Resco's petition proposed that the scope of the investigations be limited to the following:

> [C]ertain chemically bonded (resin or pitch), magnesia carbon bricks ("MCB") whose magnesia component contains at least 70 percent magnesia ("MgO"), regardless of the source of raw materials for the MgO, with carbon levels ranging from trace amounts to 30 percent, regardless of enhancements, regardless of whether or not antioxidants are present. The scope of this investigation excludes alumina-carbon bricks, alumina-silicon-carbide-carbon bricks and all dolomite class bricks.[1]

---

[1]   Fedmet further explained that MCBs can be enhanced "with coating, grinding, tar impregnation or

Joint Appendix ("J.A.") at 492-93 (footnotes omitted). In proposing that the domestic like product be defined to cover only MCBs, the petition further limited the proposed scope of the investigation by describing MCBs as the product covered by the petition and distinguishing MCBs from other types of refractory bricks:

> There are several types of standard refractory bricks *in addition to* magnesia carbon, the subject of this petition. Among the most important are fired magnesite, fired bauxite, magnesia dolomite and magnesia alumin[a] carbon brick. Each of these bricks possess certain unique properties, which make their use highly preferred, and even required, for certain uses in the lining of steel, ceramic, and other furnaces and holding vessels. The different types of bricks *are not generally substitutable in a technical sense*, due to varying chemical and physical properties and wear characteristics.

*Id.* at 498 (emphases added). This language prompted Commerce to inquire regarding the proposed scope of the investigation vis-à-vis other types of refractory bricks. In particular, as part of its pre-initiation investigation, Commerce issued a questionnaire, referring to the subject of the petition as "MCB." Resco responded to the questionnaire on August 10, 2009. Regarding Questions 6 and 7, Resco stated:

> [Question] 6. On page 10 of the petitions you state "{t}here are several types of standard refrac-

---

coking, high temperature heat treatments, anti-slip treatments or metal casing," and that anti-oxidants can be added to MCBs "from trace amounts to 15 percent by weight as various metals, metal alloys, and metal carbides." Joint Appendix at 492 n.7, n.8.

tory bricks *in addition to MCB*, the subject of this petition. Among the most important are fired magnesite, fired bauxite, magnesia dolomite, and magnesia aluminum carbon brick." How does your proposed scope exclude these types of refractory bricks?

[Answer] *The scope of our petition focuses only on MCB.* These other products do not provide the same performance where MCB are used in steelmaking and steel handling applications. Their use or substitution results in significantly lower performance, higher costs and can be disruptive to the steel maker's operation. No other system over the last 35 years helped steel makers achieve performance levels in furnace and ladles like MCB, which are used in the most critical and high wear areas of the furnaces and ladles.

[Question] 7. If necessary based on the response to the questions above, please provide a revised version of the scope of the investigations as it should appear in the Federal Register.

[Answer] Petitioner does not believe it is necessary to revise the scope based on the responses to the questions above. The complete version of the scope of the investigations as it should appear in the Federal Register is provided in the petition.

*Id.* at 505-06 (emphases added). On August 14, 2009, at Commerce's request, Resco revised its proposed scope language to remove the explicit exclusion of alumina-carbon bricks, alumina-silicon bricks and dolomite class bricks. Resco confirmed that the exclusion was unnecessary because those three types of bricks do not have the magnesia levels specified by Resco. *See id.* at 513.

Resco continued to reinforce the distinction between MCBs and other types of refractory bricks during the

preliminary injury investigation conducted by the United States International Trade Commission ("Commission"). In particular, on August 19, 2009, Resco's counsel testified before the Commission that:

> [O]ther refractory products, such as fired magnesite, fired bauxite, magnesia dolomite, and magnesia alumina graphite bricks, and the subject merchandise do not have the same physical characteristics and uses are not perceived by producers and purchasers as substitutable and are easily differentiated by price.

*Id.* at 396.

Commerce published notices of initiation of antidumping and countervailing duty investigations on August 25, 2009. In the notices, Commerce adopted almost all of the language proposed by Resco to define the scope of the investigations:

> Imports covered by this petition consist of certain chemically bonded (resin or pitch), magnesia carbon bricks with a magnesia component of at least 70 percent magnesia ("MgO") by weight, regardless of the source of raw materials for the MgO, with carbon levels ranging from trace amounts to 30 percent by weight, regardless of enhancements, (for example, magnesia carbon bricks can be enhanced with coating, grinding, tar impregnation or coking, high temperature heat treatments, anti-slip treatments or metal casing) and regardless of whether or not anti-oxidants are present (for example, antioxidants can be added to the mix from trace amounts to 15 percent by weight as various metals, metal alloys, and metal carbides).

*Certain Magnesia Carbon Bricks from the People's Republic of China and Mexico: Initiation of Antidumping Duty*

*Investigations*, 74 Fed. Reg. 42,852, 42,857 (Aug. 25, 2009); *Certain Magnesia Carbon Bricks from the People's Republic of China and Mexico: Initiation of Countervailing Duty Investigation*, 74 Fed. Reg. 42,858, 42,861 (Aug. 25, 2009).

Both Commerce and the Commission issued questionnaires to known producers, exporters and importers of subject merchandise. The Commission issued its preliminary injury determination on September 14, 2009. *See Certain Magnesia Carbon Bricks from China and Mexico*, Inv. Nos. 701-TA-468 and 731-TA-1166, -1167, USITC Pub. No. 4100 (Sep. 2009). The Commission identified the scope of the investigations as including "only chemically bonded MCBs in which the magnesia content is at least 70 percent and the carbon content ranges up to 30 percent." *Id.* at 5. The Commission also found that MCBs are not used interchangeably with other refractory products because they have "distinct uses, differ in physical characteristics, are priced higher, and are made by different production processes." *Id.* at 6. Accordingly, the Commission concluded that the domestic like product did not "include other refractory products such as fired magnesite, fired bauxite, magnesia dolomite, and magnesia alumina graphite bricks." *Id.* The Commission defined the domestic like product as MCBs,[2] making it coterminous with Commerce's determination without objection from any party. *Id.*

On September 20 and 21, 2010, Commerce published its final affirmative antidumping and countervailing determinations and issued antidumping and countervailing duty orders on MCBs from Mexico and China. The orders continued to use the scope language proposed by Resco and adopted during initiation of the investigations.

---

[2] The Commission used the term "MCB" throughout the investigation. *See generally*, USITC Pub. No. 4100.

*See Certain Magnesia Carbon Bricks from Mexico and the People's Republic of China: Antidumping Duty Orders*, 75 Fed. Reg. 57,257 (Sep. 20, 2010); *Certain Magnesia Carbon Bricks from Mexico and the People's Republic of China: Countervailing Duty Order*, 75 Fed. Reg. 57,442 (Sep. 21, 2010) (collectively, "the orders"). Likewise, the Commission's final injury determination continued to define the domestic like product as coterminous with the scope of the investigations. *See Certain Magnesia Carbon Bricks from China and Mexico*, Inv. Nos. 701-TA-468 and 731-TA-1166, -1167, USITC Pub. No. 4182 at 6-7 (Sep. 2010).

## II. Fedmet's Scope Ruling Request

Fedmet is a domestic importer of refractory bricks and other products used in the steelmaking industry. Fedmet was not a party to the antidumping and countervailing duty investigations initiated at the petition of Resco. Additionally, the record does not indicate that Fedmet was served with an antidumping or countervailing questionnaire by either Commerce or the Commission.

On May 3, 2011, Fedmet requested from Commerce a scope ruling that its Bastion® line of magnesia carbon alumina ("MAC")[3] bricks was outside the scope of the outstanding antidumping and countervailing duty orders on MCBs from China and Mexico. In its request, Fedmet indicated that its MAC bricks contain approximately 75 to 90 percent magnesia, 8 to 15 percent alumina (*i.e.* aluminium oxide), 3 to 15 percent carbon, and smaller amounts

---

[3] MAC bricks are also known as "magnesia alumina graphite bricks." The parties agree that MAC bricks have more magnesia than alumina (between 50 and 90% magnesia), but once alumina levels exceed magnesia levels (50% or more alumina), the bricks are considered "alumina-carbon bricks" or "alumina-magnesia-carbon bricks."

of silicon dioxide, calcium oxide, iron oxide and titanium dioxide. Fedmet also stated that the "significant amounts" of alumina contained in MAC bricks result in "distinct properties" that distinguish MAC bricks from MCBs. Specifically, Fedmet explained that the alumina facilitates the formation of fused magnesia spinel when MAC bricks are heated to steelmaking temperatures, which prevents cracks and decreases chemical attack by promoting permanent expansion and closing pores in the bricks.

On March 30, 2012, after receiving comments and questionnaire responses from interested parties, Commerce preliminarily determined that Fedmet's MAC bricks were included within the scope of the orders. Commerce first found that the plain language of the orders was ambiguous regarding whether "MCBs with alumina" were covered. Commerce then examined the descriptions of the subject merchandise contained in the petition, the initial investigation, the determinations of Commerce and the like product determination of the Commission. Commerce found that these sources contained language that excluded MAC bricks from the scope of the orders. Commerce nonetheless determined that these sources were not dispositive because MAC bricks were only referenced "by name" and "no technical descriptions" were provided in the underlying investigations to identify the chemical composition of MAC bricks.

Commerce therefore turned to the extrinsic information obtained from interested parties and through its own research during the scope proceedings. Commerce gave "the greatest weight" to the fact that Fedmet's MAC bricks "fall squarely" within the levels of magnesia and carbon provided in the orders. Commerce also found that Fedmet's MAC bricks have the same characteristics and uses as MCBs, and are marketed and sold in the same way and through similar channels as MCBs. Based on these findings, Commerce preliminarily determined that

Fedmet's MAC bricks were included within the scope of the orders.

Commerce issued its final scope ruling on July 2, 2012, wherein it continued to find ambiguity in the record of the underlying investigations. Acknowledging that MAC bricks had been identified as a type of refractory brick distinct from the domestic like product, Commerce observed that Resco never identified the chemical composition and technical specifications of MAC bricks, or "expressly state[d] that MAC bricks with a chemical composition like that of Fedmet Bastion® MAC bricks fall outside of the scope of the investigations or the resulting Orders." J.A. at 480. Additionally, Commerce noted that the Commission included an "MCB with added alumina" in its pricing analysis. Based on the evidence regarding the physical characteristics and uses of Fedmet's MAC bricks and the manner in which they are advertised and sold, Commerce determined that Fedmet's MAC bricks were included within the scope of the orders.

Fedmet filed suit at the Trade Court seeking to reverse Commerce's scope ruling. The Trade Court upheld Commerce's determination, finding that it was supported by substantial evidence and in accordance with law. The Trade Court agreed with Commerce that the record in the underlying investigations was not dispositive.[4] In finding ambiguity in the intrinsic record, the court relied on evidence obtained during the scope proceedings that showed that MAC bricks with more than 70% magnesia (known as "low-alumina" bricks) can also be called MCBs. The Trade Court then found that substantial evidence supported Commerce's determination that Fedmet's MAC bricks have physical characteristics and uses similar to

---

[4]    Fedmet did not challenge Commerce's conclusion that the scope language in the orders alone is not dispositive.

those of MCBs, and "are in fact interchangeable with MCBs." The Trade Court therefore affirmed Commerce's determination that Fedmet's MAC bricks are within the scope of the orders.

Fedmet timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

This Court reviews the Trade Court's grant or denial of judgment on the agency record without deference. *See Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1346 (Fed. Cir. 2005); *ThyssenKrupp Acciai Speciali Terni S.p.A. v. United States*, 603 F.3d 928, 932 (Fed. Cir. 2010). We apply anew the same standard of review used by the Trade Court. *Atar S.r.l. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013). Accordingly, we must uphold Commerce's scope determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). We review for clear error the factual findings made by the Trade Court on a motion for judgment on the agency record. *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000).

## I

The countervailing duty and antidumping duty statutes authorize Commerce to impose duties on imported goods that benefit from certain government subsidies in their country of manufacture, or that are sold in the United States at less than fair value. *See* 19 U.S.C. §§ 1671, 1673. At the conclusion of a countervailing duty or antidumping duty investigation, assuming the requisite findings are made, Commerce may issue orders imposing duties on imports of goods covered by the investigation. When questions arise as to whether a particular product is included within the scope of a countervailing or

antidumping duty order, an interested party may request that Commerce issue a "scope ruling" to clarify the scope with respect to particular products. *See* 19 C.F.R. § 351.225(a).

The plain language of a countervailing or antidumping order is "paramount" in determining whether particular products are included within its scope. *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012). In reviewing the plain language of a duty order, Commerce must consider "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1) ("the (k)(1) sources"). Only if the (k)(1) sources are not dispositive may Commerce consider the so-called (k)(2) criteria listed below:

(i)     The physical characteristics of the product;
(ii)    The expectations of the ultimate purchasers;
(iii)   The ultimate use of the product;
(iv)    The channels of trade in which the product is sold; and
(v)     The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2). We afford significant deference to Commerce's own interpretation of its orders, mindful that scope determinations are "highly fact-intensive and case-specific." *King Supply*, 674 F.3d at 1345; *see also Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995).

II

Fedmet argues that Commerce's scope ruling is not supported by substantial evidence. Fedmet maintains that the administrative record in the underlying investigations clearly demonstrates that MAC bricks were excluded from the scope of the investigations, and that

Commerce adopted the scope language proposed by Resco intending to exclude MAC bricks. According to Fedmet, the (k)(1) sources are dispositive, and Commerce's conclusion to the contrary is unsupported by substantial evidence. Fedmet argues in the alternative that, to the extent that examination of the (k)(2) factors is necessary to resolve any ambiguity, Commerce's findings under the (k)(2) factors are also unsupported by substantial evidence.

Commerce and the Intervenors below[5] respond that the (k)(1) sources are ambiguous because there is no accepted industry standard for MAC bricks, and the record of the underlying investigations does not contain any technical specifications for MAC bricks. They contend that Commerce properly proceeded to an analysis of the (k)(2) factors and that such analysis is supported by substantial evidence. According to Commerce and Intervenors, Fedmet is inviting this Court to reweigh the evidence, which the Court is not permitted to do.

We agree with Fedmet. The (k)(1) sources are dispositive and unequivocally confirm that Fedmet's MAC bricks are not within the scope of the orders. First, these sources contain multiple representations made by Resco disclaiming coverage of all MAC bricks in general. For example, Resco explicitly asserted in its petition that MCBs and MAC bricks are "not generally substitutable" and have "varying chemical and physical properties and wear characteristics." J.A. at 498. When Commerce

---

[5] Resco, ANH Refractories Co. and Magnesita Refractories Co. (collectively, "Intervenors") participated in the scope proceedings before Commerce and intervened in the case before the Trade Court. Resco was the petitioner in the underlying antidumping and countervailing investigations. ANH Refractories and Magnesita Refractories are domestic producers of MCBs.

requested confirmation that Resco's proposed language was sufficient to distinguish MCBs from other types of refractory bricks, including MAC bricks, Resco responded that no revisions were necessary and confirmed that its petition focused "only on MCB" and not other types of refractory bricks, which according to Resco "do not provide the same performance" as MCBs in steelmaking and steel handling applications. *Id.* at 506. Resco's counsel further supported the like product determination with testimony before the Commission that MAC bricks and MCBs "do not have the same physical characteristics and uses are not perceived by producers and purchasers as substitutable and are easily differentiated by price." *Id.* at 396.

Second, the (k)(1) sources confirm Commerce and the Commission's understanding that the underlying investigations did not extend to MAC bricks. Commerce specifically inquired whether the proposed scope language was sufficient to exclude other types of bricks such as MAC bricks, implicitly demonstrating an understanding that such bricks should be excluded. The Commission echoed Commerce's understanding in its final injury determination when its stated that, although MAC bricks may be used in place of MCBs for some applications, they generally "do not have the same physical properties as MCBs, are easily differentiated by price, and their uses are not perceived by the steel producers as substitutable." USITC Pub. No. 4182 at I-8.[6] This is contrary to Commerce and

---

[6] The fact that in the preliminary stage of the investigations the Commission included in its pricing analysis an "MCB with added alumina," as Commerce characterizes it, does not support Commerce's finding of ambiguity. The record clearly indicates that the products included in the Commission's pricing analysis were chosen based on their magnesia, carbon and anti-oxidant

the Trade Court's finding that the (k)(1) sources are devoid of evidence regarding physical properties of MAC bricks.

To put it simply, the question before this Court was asked and answered during the underlying investigations. Resco had an opportunity to clarify whether MAC bricks were included within the scope of the investigations, and it confirmed that they were not. In doing so, Resco chose to rely on industry terminology to continue to define the subject merchandise and the domestic like product. At the urging of Resco, Commerce adopted this industry terminology and defined the scope of the orders in terms of "magnesia carbon bricks," with the understanding that other types of bricks such as MAC bricks would not be covered. In turn, the Commission adopted Commerce's language to define the domestic like product as MCBs, relying on Resco's representation that MAC bricks are not interchangeable with MCBs. Had Resco not made these statements, it is possible that the Commission would have defined the domestic like product differently and, in so

---

levels. *See* USITC Pub. No. 4100, Part V; USITC Pub. No. 4182, Part V. Alumina is not an anti-oxidant, and there is no reference to alumina in the Commission's preliminary or final pricing analyses. The Commission's pricing analyses therefore do not constitute sufficient evidence to read ambiguity into the multiple and clearly expressed statements in the (k)(1) sources excluding MAC bricks. That the Commission might have considered pricing data for a single product outside the scope of the investigations is not a reasonable basis to later expand the scope of a duty order to cover imports of all such products. Indeed, a plausible argument could be made that the Commission erred in including pricing data related to an "MCB with added alumina," but that is not the issue here.

doing, perhaps arrived at a different injury determination.

Indeed, the Tariff Act provides that only producers of the domestic like product, or unions or associations affiliated with producers of the domestic like product, may file a petition. *See generally* 19 U.S.C. §§ 1671a(b), 1673a(b), 1677(9). A petitioner must also demonstrate that domestic producers who support the petition account for at least 25% of the total production of the domestic like product, and more than 50% of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition. *See id.* §§ 1671a(c)(4)(A), 1673a(c)(4)(A). Here, it is not clear that Resco would have been considered an "interested party" for purposes of initiating the underlying investigations if they had encompassed MAC bricks. *See* 19 U.S.C. §§ 1671a(b), 1673a(b). We see nothing in the record indicating that Resco is a domestic producer of MAC bricks, and Fedmet maintains that Resco is not. The record also contains no information regarding whether the domestic producers who supported Resco's original petition manufacture MAC bricks.

A scope analysis begins with the scope language in a final order. If the language is ambiguous, the next step is an identification of the products that were actually investigated. The inquiry includes whether the petitioner sought to explicitly include or exclude the product in question from the underlying investigation. These initial steps are necessary because, in the underlying investigation, a petitioner must balance the incentive to achieve as broad a definition of the domestic like product as possible, with the requirement that it must prove standing and injury via production and economic trade data that is relative to the product subject to the investigation. In view of this dynamic, we hold that, where a petitioner is requested to clarify with a high degree of specificity the scope of its petition, its response is highly germane to a

subsequent scope determination. A petitioner has an obligation to be explicit and precise in its definition of the scope of the petition both prior and during the investigation.

Contrary to the dissent's view, the fact that the (k)(1) sources identify no "cut-off point" at which addition of alumina to an MCB transforms it into a MAC brick does not result in ambiguity. *See* Dissent at 6. The public—including domestic importers like Fedmet—is entitled to rely on the multiple statements in the (k)(1) sources disclaiming coverage of MAC bricks. To the extent that MCBs and MAC bricks do in fact overlap to some degree, the overlap was surrendered by Resco's failure to provide a technical definition or "cut off point" when asked to be more specific.

To be clear, our holding does not "elevate" Resco's petition over the language of the orders. *See* Dissent at 8. Commerce found that the scope language in the orders was ambiguous regarding whether Fedmet's MAC bricks were covered. J.A. at 367. The Trade Court did not disturb this finding and proceeded to analyze the (k)(1) sources. *See Fedmet Res.*, 911 F. Supp. 2d at 1353. The ambiguity in the scope language arises not because of the carbon and magnesia levels—which no party disputes are met by Fedmet's MAC bricks—but because the orders are limited to "magnesia carbon bricks." This limitation is clear and unambiguous. As a result, the question of whether Fedmet's MAC bricks are covered by the orders must be resolved by examining the (k)(1) sources, which include Resco's petition, and we may only consider the (k)(2) factors if the (k)(1) sources are not dispositive. *See* 19 C.F.R. § 351.225(k).

We recognize that antidumping and countervailing duty orders "should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless*

*Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012). But the reason why the (k)(1) sources are afforded primacy in the scope analysis is because interpretation of the language used in the orders must be based on the meaning given to that language during the underlying investigations. In this case, the terms "magnesia carbon brick" and "magnesia alumina carbon brick" are ubiquitous and well-understood in the refractories industry. Indeed, Resco characterized both types of bricks as "standard."

Apparently satisfied by Resco's representations that industry terminology was sufficient, Commerce and the Commission determined not to go beyond the "name" of MAC bricks, not to provide any chemical composition or technical specifications for MAC bricks, and not to adopt an explicit exclusion for MAC bricks because it was unnecessary. These decisions cannot now operate to create ambiguity or otherwise detract from the clear import of the meaning given to the term MAC bricks in the underlying investigations. While Commerce enjoys considerable latitude in clarifying its orders, it may not change the original scope of its orders through the interpretative process. *See Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1383 (Fed. Cir. 2005); *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1095 (Fed. Cir. 2002).

It is Commerce's duty to define the scope of the merchandise that will be investigated, and it is the Commission's duty to conduct its injury determination based on the like product. Commerce also has the responsibility to define the scope of the orders "in such detail as the administering authority deems necessary." 19 U.S.C. § 1673e(a)(2). Having explicitly inquired about the exclusion of MAC bricks, and having accepted Resco's representation that no revisions to the scope language were necessary to exclude MAC bricks, Commerce cannot later depart from its previous understanding based on its own failure to define non-subject merchandise more precisely

than "by name." We therefore hold that Commerce's finding of ambiguity in the (k)(1) sources lacks substantial evidence.[7]

The Trade Court erred in relying on evidence outside the (k)(1) sources to find ambiguity within those sources. Although the court acknowledged the repeated statements in the (k)(1) sources excluding MAC bricks, it found that "two critical facts" instilled the term with "considerable ambiguity." *Fedmet Res.*, 911 F. Supp. 2d at 1354. First, the court found that "advertisements and other record evidence indicate that the term 'MACB' can refer to low-alumina bricks as well as high-alumina bricks." *Id.* Second, the court found that "record evidence of industry naming conventions reasonably suggests that so long as the magnesia content of a brick with added alumina remains above 70%, it can be called *either* an MCB *or* an MACB." *Id.* (emphasis in original). But the (k)(1) sources do not mention, much less make a distinction, between so-called "low-alumina" and "high-alumina" bricks. Indeed, in making its findings, the Trade Court relied solely on information provided by interested parties or obtained through Commerce's own research during the course of the scope proceedings. The (k)(1) sources themselves neither support the "two critical facts" nor the court's conclusion that "Resco may have intended to exclude only *some* MACBs" on which the Trade Court premised its finding of ambiguity. *Id.* (emphasis in original). Those findings therefore cannot provide the basis for holding that Commerce's finding of ambiguity in the (k)(1) sources is supported by substantial evidence.

---

[7]  Even if, in fact, MCBs do overlap to some extent with MAC bricks, there would be no inconsistency between our interpretation of the (k)(1) sources and the orders because the latter are limited to only "certain" MCBs.

In sum, because nothing in the (k)(1) sources detracts from the otherwise clear statements that *all* MAC bricks were excluded from the scope of the underlying investigations, we hold that the (k)(1) sources are dispositive of the question presented by Fedmet's scope ruling request. Commerce erred in proceeding to analyze the (k)(2) factors, and we decline to review such analysis.[8] *See Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1076 (Fed. Cir. 2001). Because Fedmet's bricks are MAC bricks, we hold that they are not covered by the orders.

CONCLUSION

Commerce's scope ruling is unsupported by substantial evidence. We therefore reverse the Trade Court's decision and grant Fedmet's motion for judgment on the agency record. We hold that Fedmet's Bastion® MAC bricks are outside the scope of the countervailing and antidumping orders at issue in this case. We remand for further proceedings in accordance with this opinion.

**REVERSED AND REMANDED**

---

[8] Interestingly, in their analysis of the (k)(2) factors, Commerce and the Trade Court arrived at different conclusions than the Commission when it analyzed the physical characteristics and uses, interchangeability, channels of distribution, manufacturing processes, and customer perception of MCBs. *See* USITC Pub. No. 4182 at 6. The Commission's analysis of these factors is part of the (k)(1) sources.

# United States Court of Appeals
# for the Federal Circuit

---

**FEDMET RESOURCES CORPORATION,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

AND

**ANH REFRACTORIES COMPANY,**
*Defendant-Appellee,*

AND

**RESCO PRODUCTS, INC. AND
MAGNESITA REFRACTORIES COMPANY,**
*Defendants-Appellees.*

---

2013-1539

---

WALLACH, *Circuit Judge*, dissenting.

The majority fails to ground its analysis in the plain language of the scope of the investigation, as defined in the antidumping and countervailing duty orders for MCBs ("the Orders"), and instead focuses on the petition of a domestic producer, contrary to the governing regulation. Because I would affirm the decision of the Court of International Trade ("CIT"), I respectfully dissent.

Fedmet's merchandise has concentrations of magnesia and carbon falling within the scope of the Orders. The majority nevertheless holds Commerce erred in finding Fedmet's magnesia alumina carbon ("MAC") bricks were subject to the Orders because the (k)(1) sources "disclaim" MAC bricks. The trouble is that the (k)(1) sources never define the "disclaimed" MAC bricks except to say they have different features, uses, and prices than MCBs. Some MCBs with added alumina were in fact investigated as MCBs during the Commission's investigation, and none of the (k)(1) sources address *how much* alumina must be added before MCBs become MAC bricks that fall outside the scope of the Orders. Instead, the (k)(1) sources indicate that any MCBs with the recited carbon and magnesia concentrations would possess MCBs' characteristic strength and usefulness. Substantial record evidence supports Commerce's finding that the (k)(1) sources do not dispositively resolve whether Fedmet's products are MCBs covered by the Orders, or are instead MAC bricks with different characteristics, uses, and prices. It was thus proper for Commerce to consider the (k)(2) sources.

In holding otherwise, the majority fails to defer to Commerce's factual findings with respect to industry terminology, and instead makes its own contrary findings that are unsupported by the record. It also criticizes Commerce for failing to specifically define MCBs and MAC bricks in its Orders, even though binding regulation states "the descriptions of subject merchandise . . . *must be written in general terms*." 19 C.F.R. § 351.225(a) (2009) (emphasis added). Finally, the majority relies heavily on a domestic producer's petition instead of grounding its analysis in the plain language of the Orders, as required by this court's precedent. Because the record supports Commerce's finding that adding 8 to 15% alumina to otherwise dutiable MCBs does not remove them from the scope of the Orders, I would affirm.

A scope ruling involves a "highly fact-intensive and case-specific determination," *King Supply Co. LLC v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012), which is "particularly within the expertise of [Commerce]," *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998). "Commerce enjoys substantial freedom in conducting such scope inquiries," *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001), and this court must affirm Commerce's determination as long as it is supported by substantial evidence, *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1378 (Fed. Cir. 2007).

"[T]he plain language of the . . . order is paramount" in conducting a scope ruling. *King Supply*, 674 F.3d at 1345. "[T]he first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous." *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012). The Orders in this case define MCBs as having "a magnesia component of at least 70 percent magnesia . . . by weight" and "carbon levels ranging from trace amounts to 30 percent by weight." J.A. 18.122. Fedmet's merchandise contains "approximately 75 to 90 percent magnesia and 3 to 15 percent carbon," and thus "fall[s] squarely within the ranges identified in the scope of the Orders." *See* J.A. 367. The Orders further state that MCBs may have added antioxidants "from trace amounts to 15 percent by weight as various metals, metal alloys, and metal carbides," J.A. 18.122, and Fedmet's merchandise contains alumina at a concentration of 8 to 15%. Finally, the Orders state MCBs are classifiable under, inter alia, Harmonized Tariff Schedule of the United States

("HTSUS") 6902.10, which is the subheading covering Fedmet's merchandise.[1] *See* J.A. 345, 347.

"Based on the magnesia and carbon content alone," Commerce found Fedmet's merchandise "f[e]ll within the scope of the Orders," but it identified a "potential ambiguity regarding whether the . . . scope covers MCBs with alumina." *See* J.A. 367. To resolve this question, Commerce considered the (k)(1) sources, which are "[t]he descriptions of the merchandise contained in the petition, the initial investigation, *and* the determinations of [Commerce] (including prior scope determinations) and the Commission." *See* 19 C.F.R. § 351.225(k)(1) (emphasis added).

The (k)(1) sources in this case include the Commission's investigation and injury determinations. The Commission's pricing investigation included MCBs with 4.6% added alumina, J.A. 370, which were also mentioned in the Commission's injury determination, *see* J.A. 18.23 & n.135 (stating the Commission "collected quarterly f.o.b. pricing data for three MCB products" including "Resco's brand Maxline 10 AFX"); *see also* J.A. 309–10 (finding the Maxline 10 AFX was an "MCB with alumina"), 323, 370, 438, 459.[2] Although 4.6% is less than the 8 to 15% alumina contained in Fedmet's merchandise, the inclusion of MCBs with alumina demonstrates that simp-

---

[1]    "[T]he tariff schedule is . . .  a factor in determining the scope of the Order." *Eckstrom*, 254 F.3d at 1073.

[2]    The majority states "it is not clear that Resco would have been considered an 'interested party' for purposes of initiating the underlying investigations if they had encompassed MAC bricks." Majority Op. at 16. However, Resco sold MCBs with 4.6% added alumina, which is only 3.4% less alumina than some of Fedmet's products.

ly adding alumina to otherwise subject MCBs does not automatically withdraw them from the scope of the Orders.

The remaining (k)(1) sources do not dispositively show that MCBs with 8 to 15% alumina are excluded from the Orders. To the contrary, Resco's petition emphasizes that the combination of carbon and magnesia in MCBs results in "[h]igh thermal conductivity, . . . [r]educed porosity, . . . [h]igh corrosion resistance[, and] [g]ood reaction to alkaline environments." J.A. 499. Fedmet's products contain the requisite concentrations of carbon and magnesia, suggesting they share these characteristics. Resco's petition states MCBs had different characteristics and uses than other refractory bricks (including MAC bricks), but did not define the different types of refractory bricks. Nor did Resco suggest how much alumina must be added to MCBs before they become MAC bricks with characteristics "unique" from MCBs. *See* J.A. 498.

Resco's questionnaire responses also demonstrate the (k)(1) sources are not dispositive with regard to the amount of alumina needed to transform an MCB into a MAC brick. On August 10, 2009, in response to Commerce, Resco stated "[t]he scope of our petition focuses only on MCB." J.A. 506. However, four days later, Resco revised the scope language to remove the explicit exclusion of alumina carbon bricks, alumina-silicon bricks and dolomite class bricks, and confirmed the exclusion was unnecessary since the bricks did not have the requisite magnesia levels specified by Resco. *See* J.A. 513. These questionnaire responses necessarily create petition ambiguity.

Furthermore, none of Resco's questionnaire responses addresses the ambiguity posed by the Orders: whether adding 8 to 15% alumina withdraws otherwise-subject MCBs from the Orders' scope. J.A. 506, 510, 513. There is no indication from the (k)(1) sources that Fedmet's

products are "MAC bricks" excluded by Resco's petition and the Final Commission Determination. Commerce properly found the lack of "technical descriptions" made it impossible "to identify the chemical composition of MAC bricks." J.A. 368. Commerce was supported by substantial evidence in finding the (k)(1) sources did not address, much less dispositively resolve, whether adding 8 to 15% alumina withdraws MCBs from the scope of the order.

The majority ignores this definitional problem. It states Resco "disclaim[ed] coverage of *all* MAC bricks in general." Majority Op. at 13 (emphasis added). If adding *any* alumina to MCBs withdraws them from the Orders' scope, the majority fails to explain how the Commission's Final Determination could encompass MCBs with 4.6% added alumina. On the other hand, if adding only small amounts of alumina is insufficient to transform an MCB into a MAC brick, the majority does not identify any cut-off point. Indeed, the majority admits as much in stating "the (k)(1) sources do not mention, much less make a distinction, between so-called 'low-alumina' and 'high-alumina' bricks." Majority Op. 19.[3]

---

[3]    The majority explains this overlap between MCBs and MAC bricks by stating that any overlap was "surrendered by Resco's failure to provide a technical definition or 'cut off point' when asked to be more specific." Majority Op. at 17. The majority does not cite any authority for this new "surrender" doctrine nor does it explain how Resco's purported "surrender" limits Commerce's discretion in interpreting the Orders' scope. Commerce is an administrative agency. Its scope rulings warrant deference from this court and it is not limited by a petitioner's inadequate responses. Indeed, the majority contradicts itself in stating that "the ambiguity in the scope language arises not because of the carbon and magnesia levels—

By failing to acknowledge this definitional problem, the majority leaves the Orders open to manipulation. Rather than paying the antidumping and countervailing duties on MCBs, importers can simply add small amounts of alumina to their products and label them MAC bricks instead of MCBs.

The majority nonetheless states MAC bricks were adequately defined based on Resco's statement that MAC bricks and MCBs "'do not have the same physical characteristics and uses are not perceived by producers and purchasers as substitutable and are easily differentiated by price.'" Majority Op. at 14 (quoting J.A. 396). But it never establishes whether Fedmet's products fall within this definition of MAC bricks, i.e., whether they have different physical characteristics from MCBs and are easily distinguishable by price.

Indeed, Commerce's consideration of the (k)(2) factors demonstrates that Fedmet's merchandise is not materially distinguishable from MCBs.[4] Commerce found that Fedmet's merchandise "share[s] physical characteristics with in-scope MCBs." J.A. 485. It relied on the *Millennium Steel* study, which "specifically found that adding alumina to MCBs resulted in controlled expansion, better

---

which no party disputes are met by Fedmet's MAC bricks—but because the orders are limited to 'magnesia carbon bricks.' This limitation is clear and unambiguous." Majority Op. at 17. If the language from the Orders regarding MCBs is clear and unambiguous then Fedmet should have challenged the CIT's finding that the scope language itself was ambiguous, an assertion it did not make. *See id.* at 10 n.4.

[4]    Because the k(1) sources did not definitively resolve this question, Commerce rightly turned to the k(2) sources. *See* 19 C.F.R. § 351.225(k).

slag corrosion resistance, and enhanced ladle life due to better spalling resistance, *all noted properties of MCBs*." J.A. 483 (emphasis added). Commerce found "carbon plays the critical role in preventing slag penetration when the magnesia content falls within the range identified in the scope of the Orders," and "conclude[d] that carbon in Fedmet['s merchandise] performs the same essential function as it does in MCBs." J.A. 484. Commerce found this was consistent with the Orders, which include MCBs with metal additives of up to 15% as long as the prescribed levels of magnesia and carbon "ensure key properties of in-scope MCBs were met." J.A. 484. Commerce also found Fedmet's merchandise and MCBs "are sold in the same channels of trade and are similarly marketed and advertised for the same uses." J.A. 485. Under any performance-based definition of the goods—which, in this case, is all that the (k)(1) sources provide—Fedmet's merchandise is subject to the MCB Orders.

The majority's holding to the contrary contravenes precedent by elevating certain purported "disclaimers" by Resco over the language of the Orders. This court has made clear that the language of an order is "paramount" in conducting a scope analysis. *King Supply*, 674 F.3d at 1345. But the majority mentions the Orders only once, and focuses primarily on Commerce's "implicit[] . . . understanding" based on Resco's representations.[5] *See*

---

[5] In other contexts, the CIT has cautioned against overreliance on a domestic producer's petition. *See, e.g.*, *Yantai Xinke Steel Structure Co. v. United States*, No. 10–00240, 2012 WL 2930182 (Ct. Int'l Trade July 18, 2012) ("[T]he petition constitutes nothing more than 'an allegation of dumping, not a determination of dumping.'" (quoting *Zhejiang Native Produce & Animal By–Prod. Imp. & Exp. Corp. v. United States*, Slip. Op. 11–110, at 20

Majority Op. at 14. The majority's analysis is strikingly similar to that prescribed by the CIT in *Duferco Steel, Inc. v. United States*, 146 F. Supp. 2d 913, 921–22 (Ct. Int'l Trade 2001). There, the CIT stated:

> In determining whether a particular product is within the scope of an [antidumping] or [countervailing duty] order, Commerce must first consider whether the underlying petitions cover the product. If the petitions are ambiguous, Commerce must examine the preliminary and final determinations, prior notices of initiation, and any available ITC publications. If the scope of the particular product is still unclear, Commerce must look to other criteria, including an analysis of the [(k)(2) criteria].

*Id.* (internal quotation marks and citations omitted). This court reversed the CIT, holding the CIT's "description of this interpretive process has it *exactly backwards*." *Duferco Steel, Inc. v. United States,* 296 F.3d 1087, 1096 (Fed. Cir. 2002) (emphasis added). We explained "[t]he critical question is not whether the petition covered the merchandise or whether it was at some point within the scope of the investigation," but instead "whether the [ ] final scope orders included the subject merchandise." *Id.* The majority makes the same error as the CIT in *Duferco* by focusing only on whether Resco's petition "covered the merchandise," *see id.*; *see also* Majority Op. at 13–16 (considering whether Resco's petition and other state-

---

(2011)) (citing Manual for the Practice of U.S. International Trade Law 595 (William K. Ince & Leslie A. Glick, eds. 2001))). By elevating Resco's petition over the Orders themselves, the majority prioritizes Resco's allegations over the final findings of the investigations as reflected in the language of the Orders.

ments excluded MAC bricks).  The majority fails to make the proper inquiry: whether substantial evidence supports Commerce's finding that the Orders, properly interpreted under 19 C.F.R. § 351.225(k), cover Fedmet's merchandise.

Even more concerning is the majority's refusal to defer to Commerce's expertise.  This court has emphasized that "scope orders must necessarily be written in general terms, and [Commerce] enjoys substantial freedom to interpret and clarify its antidumping orders, in accordance with the methodology set forth in its regulation, 19 C.F.R. § 351.225(k)."  *Duferco Steel*, 296 F.3d at 1096–97 (internal quotation marks and citations omitted).  Yet the majority imposes a new duty on Commerce to specifically "define the scope of the orders."  Majority Op. at 18.  It scolds Commerce for failing "to go beyond the 'name' of MAC bricks" and for not providing "any chemical composition or technical specification for MAC bricks."  *Id.*

Although it is apparent in hindsight that such a specific definition would be helpful in resolving this dispute, Commerce had no obligation to provide a "technical specification for MAC bricks."  *Id.*  Section 351.225(a) instead provides that "the descriptions of subject merchandise contained in [Commerce's] determinations *must be written in general terms*."  19 C.F.R. § 351.225(a) (emphasis added).  Commerce cannot be expected to predict every potential variation in imported merchandise in the original order.  The majority violates § 351.225 in its new rule preventing Commerce from resolving ambiguity that results from "[Commerce's] own failure to define non-subject merchandise more precisely than 'by name.'"  Majority Op. at 18–19.

The majority states that Commerce's earlier decisions "cannot . . . operate to create ambiguity . . . in the underlying investigations," even though Commerce's decisions and the underlying investigations are both (k)(1) sources.

*Id.* at 18. Ambiguity in any of the (k)(1) sources likely means they are not dispositive, requiring consideration of the (k)(2) factors. *See* 19 C.F.R. § 351.225(k). The majority's refusal to take cognizance of certain ambiguities (i.e., the ambiguities in Commerce's decisions) is unsupported by regulation. It is simply inappropriate for this court to dictate to Commerce which (k)(1) factors are more "germane" than others. *See* Majority Op. at 16; *see also Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1363 (Fed. Cir. 2005) ("[A]n agency's interpretation of its own regulations is entitled to broad deference from the courts." (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

Finally, the majority fails to defer to Commerce's factual findings. For example, the majority finds "the terms [MCB] and [MAC brick] are ubiquitous and well-understood in the refractories industry," Majority Op. at 18, a finding necessary to support its conclusion that Resco's purported disclaimer of MAC bricks unambiguously removed Fedmet's merchandise from the Orders' scope. That finding, however, directly conflicts with Commerce's finding that "[a]ll parties acknowledge that there is *no industry standard* for MAC bricks." J.A. 484 (emphasis added); *see also Fedmet Res. Corp. v. United States*, 911 F. Supp. 2d 1348, 1351 (Ct. Int'l Trade 2013) ("All parties agree there is no standard chemical definition for bricks marketed as MAC[ bricks]" (citing Final Scope Ruling at 9; Pl.'s Reply 6)). The majority's narrative—that Commerce "adopted this industry terminology" and "underst[ood] that other types of bricks such as MAC bricks would not be covered"—is nowhere in the record. Majority Op. at 15. The resulting conclusion that the (k)(1) sources unambiguously exclude Fedmet's merchandise from the Orders is inconsistent with the record, and

fails to defer to Commerce's well-considered findings.[6] Our law requires deference the majority denies to these agency findings.

Because I would affirm the CIT's decision upholding Commerce's scope ruling, I respectfully dissent.

---

[6]    To the extent the CIT erred in relying on (k)(2) factors in its (k)(1) analysis, *see* Majority Op. at 18, such error is harmless.  This court reviews the CIT de novo, and asks only whether substantial evidence supports *Commerce's* determination.