# United States Court of Appeals for the Federal Circuit

---

**UNITED STEEL AND FASTENERS, INC.,**
*Plaintiff-Cross-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

**SHAKEPROOF ASSEMBLY COMPONENTS DIVISION OF ILLINOIS TOOL WORKS, INC.,**
*Defendant*

---

2017-2168, 2017-2188

---

Appeals from the United States Court of International Trade in No. 1:13-cv-00270-JCG, Judge Jennifer Choe-Groves.

---

Decided: January 13, 2020

---

NED H. MARSHAK, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, New York, NY, argued for plaintiff-cross-appellant. Also represented by EDWARD B. ACKERMAN; KAVITA MOHAN, ANDREW THOMAS SCHUTZ, Washington, DC.

MICHAEL D. SNYDER, Commercial Litigation Branch,

Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by ROBERT EDWARD KIRSCHMAN, JR., PATRICIA M. MCCARTHY, JOSEPH H. HUNT; JESSICA DIPIETRO, NANDA SRIKANTAIAH, Office of Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

––––––––––––––––––

Before MOORE, REYNA, and STOLL, *Circuit Judges.*

REYNA, *Circuit Judge.*

The United States Department of Commerce appeals the United States Court of International Trade's determination that Commerce lacks authority to retroactively suspend liquidation of helical spring lock washers entered on or after the issuance date of an antidumping duty order. United Steel and Fasteners, Inc., an importer of the helical spring lock washers under investigation, cross-appeals the Court of International Trade's affirmance of Commerce's determination that its washers are within the scope of the antidumping duty order. Because we conclude that Commerce's retroactivity determination was improper and substantial evidence supports Commerce's scope ruling, we affirm.

## BACKGROUND

### I.   The *ADD Order*

Shakeproof Assembly Components Division of Illinois Tool Works Inc. ("Shakeproof") is a U.S. domestic producer of lock washers. In 1992, Shakeproof filed a petition (the "Petition") for the imposition of antidumping duties on imports of certain helical spring lock washers from China. After examining the Petition, Commerce initiated an antidumping investigation. Commerce determined that imports of certain helical spring lock washers from China were being sold at less than fair value, and on October 19,

1993, it issued the antidumping duty order at issue in this appeal. *See Certain Helical Spring Lock Washers From the People's Republic of China*, 58 Fed. Reg. 53,914 (Dep't of Commerce Oct. 19, 1993), *as amended*, 58 Fed. Reg. 61,859 (Dep't of Commerce Nov. 23, 1993) ("*ADD Order*"). Commerce's *ADD Order* describes the subject merchandise as follows:

> [C]ertain helical spring lock washers (HSLWs) are circular washers of carbon steel, of carbon alloy steel, or of stainless steel, heat-treated or non heat-treated, plated or non-plated, with ends that are off-line. HSLWs are designed to: (1) Function as a spring to compensate for developed looseness between the component parts of a fastened assembly; (2) distribute the load over a larger area for screws or bolts; and (3) provide a hardened bearing surface. The scope does not include internal or external tooth washers, nor does it include spring lock washers made of other metals, such as copper. The lock washers subject to this investigation are currently classifiable under subheading 7318.21.0000 of the Harmonized Tariff Schedule of the United States (HTSUS).

*ADD Order*, 58 Fed. Reg. at 53,914–15.

## II. Scope Ruling

United Steel and Fasteners, Inc., ("US&F") is a U.S. importer of lock washers that meet the specifications of the American Railway Engineering and Maintenance-of-Way

Association ("AREMA").[1]  US&F imports the washers under HTSUS subheading 7318.21.0090, without declaring them subject to the *ADD Order*.

On April 9, 2013, US&F requested an official scope ruling from the United States Department of Commerce ("Commerce") pursuant to 19 C.F.R. § 351.225(c).  In its request, US&F alleged that its washers were not covered by the *ADD Order*.  US&F explained that United States Customs and Border Protection ("CBP") was "aware of the HTSUS clarification being utilized by US&F," and that "[a]fter reviewing US&F's response to a CBP Notice of Proposed Action, CBP is allowing USF to continue making entry under heading 7318.21.0090[] with the understanding that this scope determination was being readied and shortly filed."[2]  J.A. 70.

On July 8, 2013, without initiating a scope inquiry, Commerce issued a final scope ruling that US&F's washers are within the scope of the *ADD Order* based on the factors listed in 19 C.F.R. § 351.225(k)(1).  Commerce also instructed CBP to suspend liquidation of "all unliquidated entries of merchandise made on or after the first day merchandise subject to the [ADD] Order was suspended for antidumping purposes and collect cash deposits on all such entries."  J.A. 396.  Liquidation was suspended to October 19, 1993, the date the *ADD Order* was issued and the first day CBP originally suspended liquidation of merchandise subject to this order.  US&F appealed Commerce's scope

---

[1]    AREMA is a professional engineering association responsible for setting engineering standards for certain railway washers.

[2]    Neither US&F's scope request, nor the record on appeal, provide any more information about CBP's Notice of Proposed Action and its decision to allow US&F's importation of washers under heading 7318.21.0090 and without deposit of estimated antidumping duties.

ruling and its instructions to retroactively suspend liquidation to the United States Court of International Trade ("CIT"). *United Steel & Fasteners, Inc. v. United States*, 203 F. Supp. 3d 1235, 1241 (Ct. Int'l Trade 2017).

The CIT affirmed Commerce's scope ruling and reversed and remanded Commerce's retroactivity determination. *Id.* at 1247–48. The CIT determined that Commerce exceeded its regulatory authority by ordering retroactive suspension of liquidation back to 1993 and ordered that Commerce draft new suspension of liquidation instructions. *Id.* at 1248, 1255. On remand, Commerce issued new instructions to suspend liquidation on or after July 8, 2013, the date when Commerce issued the final scope ruling regarding US&F's washers. The CIT determined that Commerce's new suspension instructions complied with its remand order and entered judgment.

Commerce now appeals the CIT's judgment on retroactivity and US&F cross-appeals the CIT's affirmance of Commerce's scope ruling. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review decisions of the CIT *de novo*, applying the same substantial evidence standard the CIT uses in reviewing Commerce's antidumping duty determinations. *AMS Assocs., Inc. v. United States*, 737 F.3d 1338, 1342 (2013). We have consistently emphasized that Commerce is entitled to substantial deference when interpreting its own antidumping duty orders because the meaning and scope of such orders is within Commerce's particular expertise and special competence. *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (citing *Tak Fat Trading Co. v. United States,* 396 F.3d 1378, 1382 (Fed. Cir. 2005); and *Sandvik Steel Co. v. United States,* 164 F.3d 596, 600 (Fed. Cir. 1998)). As a result, parties challenging Commerce's scope determinations under substantial evidence review confront a high barrier to

reversal. *Id.* (quoting *Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1352 (Fed. Cir. 2006)). That the evidence in the record could result in two inconsistent conclusions does not, alone, prevent Commerce's conclusion from being supported by substantial evidence. *Id.* (quoting *Am. Silicon Techs. v. United States,* 261 F.3d 1371, 1376 (Fed. Cir. 2001)). Because the retroactivity issue depends upon whether US&F's washers are covered by the *ADD Order*, we address the scope ruling issue first.

## I. Scope Ruling

When issues arise as to whether a product is within the scope of an antidumping duty order, Commerce "issues 'scope rulings' that clarify the scope of an order . . . with respect to particular products." 19 C.F.R. § 351.225(a). An interested party may submit an application with Commerce for a scope ruling. *Id.* at § 351.225(c)(1). Relevant to this case, Commerce may render a scope ruling with or without a "scope inquiry," a broader inquiry as to whether a product is included within the scope of an antidumping duty order. Commerce's decision to initiate a scope inquiry turns on whether it can render a scope ruling based solely upon a party's application for a scope ruling and the descriptions of the subject merchandise referred to in § 351.225(k)(1). *Id.* at § 351.225(e). Paragraph (k)(1) provides that Commerce will consider the "descriptions of the merchandise contained in the petition [for imposition of an antidumping duty order], the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the [International Trade] Commission." *Id.* at § 351.225(k)(1). If Commerce can render a ruling on that basis, it will issue a scope ruling. If not, it will initiate a scope inquiry and will further consider:

> (i) The physical characteristics of the product;
> (ii) The expectations of the ultimate purchasers;
> (iii) The ultimate use of the product;

(iv) The channels of trade in which the product is sold; and

(v) The manner in which the product is advertised and displayed.

*Id.* at § 351.225(k)(2). Commerce's analysis of the (k)(1) sources against the product in question produces "factual findings reviewed for substantial evidence." *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017) (citing *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919–22 (Fed. Cir. 2014) (reviewing Commerce's analysis under § 351.225(k)(1) for substantial evidence)). Here, Commerce determined that US&F's washers were within the scope of the *ADD Order* based solely on the (k)(1) sources and, thus, did not initiate a scope inquiry. J.A. 393.

US&F argues that its washers have a distinct design and function from helical spring lock washers subject to the scope of the *ADD Order*. Commerce responds that US&F's washers are "spring" washers, "helical" in nature, and function as lock washers, and, thus, within the scope of the *ADD Order*. As previously noted, the *ADD Order* covers "certain *helical* spring lock washers (HSLWs)." *ADD Order* at 58 Fed. 53,914 (emphasis added). The parties do not dispute that US&F's washers are spring lock washers. Instead, they dispute whether US&F's AREMA washers are "helical," and, if so, whether they are the helical type covered by the *ADD Order*.

In determining that US&F's washers are "helical," Commerce looked to the Petition, a (k)(1) source, and concluded that "helical" means "both a description of appearance, *i.e.*, in the form of a helix, and a spring-like attribute or locking function to prevent loosening which is present when the helix is compressed." J.A. 391 (citing Petition at 5–6). Commerce then noted that the "pictures provided by US&F clearly show the helical aspect of AREMA washers." J.A. 392 (citing US&F's Scope Request). Commerce also noted that "[a] significant portion" of helical spring lock

washers of "larger sizes are used for installation of railroad tracks." J.A. 392 (quoting Petition at 3). Commerce noted that this is precisely the type of application for which the US&F's washers are designed. Taken together, this is substantial evidence that supports Commerce's conclusion that US&F's washers are "helical" spring lock washers that fall within the scope of the *ADD Order*.

US&F argues that Commerce failed to consider that US&F's washers are used only in the rail industry, unlike the helical spring lock washers subject to the *ADD Order,* which are used for mechanical applications, such as in machinery and vehicles. We reject this argument. Commerce acknowledged that US&F's washers are used for railways but that this trade usage did not exclude them from the scope of the *ADD Order*. Commerce explained that, given the language of the *ADD Order* and the Petition, the subject helical spring lock washer is not defined by a specific trade or industry but by its physical and functional "helical" characteristic. Moreover, as noted above, the Petition even mentions that a "significant" portion of larger sized helical spring lock washers are used for railway purposes, evincing that subject helical spring lock washers are used in the railway industry in addition to mechanical applications.

US&F next argues that Commerce improperly disregarded a "critical" physical difference between the cross-sections of the subject helical spring lock washers and US&F's washers, with the former being trapezoidal and the latter, rectangular. We disagree. Commerce explicitly acknowledged that "helical spring lock washers are generally designed with a trapezoidal cross section," but that "this attribute does not change the basic function of the washer; it simply adds to the spring or locking function the helix provides." J.A. 392. Commerce also noted that there was no evidence that helical spring lock washers were always trapezoidal.

US&F finally argues that Commerce failed to properly consider that its washers, certified pursuant to AREMA standards, were neither described in the Petition nor subject to the initial antidumping duty investigation in 1992. In particular, US&F argues that because the Petition and the investigation record reference the American Society of Mechanical Engineers ("ASME") certification standards instead of the AREMA certification standards, this is evidence that its washers do not fall within the scope of the *ADD Order*. This argument is not persuasive. As Commerce explained, the language of the *ADD Order*, the Petition, and the record of the initial investigation did not specify that subject helical spring lock washers must be designed to meet ASME or any other specific industry specification or that lock washers designed to meet AREMA standards were excluded. Thus, the fact that AREMA certification standards were not described in the Petition or in the investigation record does not mean that US&F's AREMA washers are excluded from the scope of the *ADD Order*.

In sum, because we find that Commerce's scope determination is supported by substantial evidence, we affirm.

## II. Retroactivity

The second issue on appeal concerns whether Commerce's retroactive suspension of liquidation was lawful. The parties do not dispute that, after Commerce issues a final affirmative scope ruling, Commerce may retroactively suspend liquidation for all unliquidated entries entered on or after the initiation date of the scope inquiry. 19 C.F.R. § 351.225(l)(3). Section 351.225(l)(3), however, is silent as to how far back suspension of liquidation can go when there has been no scope inquiry.

An agency's interpretation of its own ambiguous regulation is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The Supreme Court recently clarified in *Kisor*

*v. Wilkie* that a court should not afford *Auer* deference unless "the regulation is genuinely ambiguous." 139 S. Ct. 2400, 2415 (2019). "[I]f there is only one reasonable construction of a regulation . . . then a court has no business to deferring to any other reading." *Id.* If a genuine ambiguity remains, then the agency's reading must still be reasonable in order to receive *Auer* deference. *Id.*

Commerce's regulatory authority concerning suspension of liquidation following a final affirmative scope ruling is contained at 19 C.F.R. § 351.225(l)(3). Section 351.225(l)(3) provides:

> (3) If the Secretary issues a final scope ruling, under either paragraph (d) or (f)(4) of this section, to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this section will continue. ***Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation*** and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption ***on or after the date of initiation of the scope inquiry.*** If the Secretary's final scope ruling is to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the subject product ended and will instruct the Customs Service to refund any cash deposits or release any bonds relating to this product.

19 C.F.R. § 351.225(l)(3) (emphases added). This regulation is clear. When Commerce issues a final scope ruling, and liquidation has not previously been suspended, Commerce may suspend liquidation beginning "on or after the date of initiation of the scope inquiry." *Id.* The regulation does not

allow suspension of liquidation before a scope inquiry. Affording Commerce deference here would permit Commerce "under the guise of interpreting a regulation, to create *de facto* a new regulation." *Kisor*, 139 S. Ct. at 2415 (internal quotations omitted).

Supporting our interpretation is *AMS*, in which we determined that identical language in another subsection of § 351.225 was unambiguous. *AMS*, 737 F.3d at 1343. In *AMS*, Commerce did not conduct a scope inquiry yet retroactively suspended liquidation to January 31, 2008, the beginning of the relevant administrative review period with respect to an antidumping duty order. *Id.* At issue was whether Commerce could do so pursuant to § 351.225(l)(2). *Id.* The only relevant difference between that subsection and 351.225(l)(3) at issue here is that the former applies to preliminary scope rulings while the latter applies to formal scope rulings. Notably, both sections provide that if liquidation has not yet been suspended, then suspension of liquidation occurs "on or after the date of initiation of the scope inquiry." 19 C.F.R. § 351.225(l)(2), (3). Focusing on this language, the court noted that "the suspension of liquidation and imposition of antidumping cash deposits may not be *retroactive* but can only take effect 'on or after the date of the initiation of the scope inquiry.'" *AMS*, 737 F.3d at 1344. The court explained that "[t]he *unambiguous* language of the regulation only authorizes Commerce to act on a *prospective* basis, and such express prospective authorization reasonably is interpreted to preclude retroactive authorization." *Id.* (first emphasis added). The court concluded that Commerce's suspension instructions to CBP were "clearly inconsistent with the limited prospective authority provided by § 351.225(l)(2)" and, thus, Commerce exceeded its regulatory authority. *Id.*

Here, like in *AMS*, Commerce did not initiate a scope inquiry and yet issued instructions to CBP to retroactively suspend liquidation to October 19, 1993, the issuance date of the *ADD Order*. Thus, Commerce's instructions are

"clearly inconsistent with the limited prospective authority provided" by § 351.225(l)(3) and must be vacated.

Even if § 351.225(l)(3) could arguably be viewed as ambiguous, Commerce's interpretation is not "within the bounds of reasonable interpretation." *Kisor*, 139 S. Ct. at 2416 (internal quotations omitted). This court will not defer to an agency's interpretation of a regulation when the evidence shows that "the proffered interpretation runs contrary to the intent of the agency at the time of enactment of the regulation." *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 837 (Fed. Cir. 2006) (citing *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

Here, the regulatory history of § 351.225(l)(3) indicates that Commerce intended to limit the reach of retroactive suspension of liquidation. Prior to promulgating this regulation, Commerce received comments from the public that, after an affirmative scope ruling, Commerce should suspend liquidation for all unliquidated entries, even those that were entered prior to the initiation of a scope inquiry. *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,327–28 (Dep't Commerce May 19, 1997). The public argued that "the Department must view any merchandise that it determines to be within the scope of an order as always having been within the scope" since "scope rulings only clarify, and do not expand, the scope of an order." *Id*. Commerce, however, did not do this. Instead, Commerce tailored § 351.225(l)(3), noting that if liquidation has not yet been suspended, then suspension of liquidation would occur on entries "made *on or after the date of initiation of the scope inquiry* and that remain unliquidated as of the date of publication of the affirmative ruling." *Id*. at 27,328 (emphasis added). In so doing, Commerce explained that "[s]uspension of liquidation is an action with a potentially significant impact on the business of U.S. importers and foreign exporters and producers." *Id*. Commerce also explained that "when liquidation has not been suspended, Customs, at least, and perhaps the Department

as well, have viewed the merchandise as not being within the scope of an order, importers are justified in relying upon that view, at least *until the Department rules otherwise.*" *Id.* (emphasis added). Thus, Commerce's current position, that suspension of liquidation can extend back to the issuance date of the *ADD Order*, after US&F relied on the government's liquidation of its product for almost twenty years, runs counter to Commerce's prior position evidenced in the regulatory history. Commerce cannot now change course and broadly apply § 351.225(l)(3).

Commerce argues that its interpretation of § 351.225(l)(3) was reasonable and should be afforded deference. Commerce notes that it did not conduct a scope inquiry and instead entered a scope ruling based on the (k)(1) factors. Thus, Commerce argues, US&F's washers were "clearly" subject to the *ADD Order* and it was "reasonable for Commerce to conclude that liquidation should have been suspended from the date of the initial suspension for merchandise subject to the order." We disagree.

As the CIT noted, there was a genuine issue as to whether US&F's washers were in scope. J.A. 29. Before US&F requested a scope ruling at the behest of CBP, CBP had not been collecting deposits of antidumping duties on US&F entries for almost twenty years, suggesting that CBP initially did not view US&F entries as within the scope of the *ADD Order. Id.* In light of this uncertainty, Commerce granted US&F's request for a scope ruling. *Id.* Although Commerce characterizes its scope ruling as not materially clarifying the scope of the *ADD Order* but merely confirming that US&F's washers were in scope, Commerce misapprehends the nature of a scope ruling. As the CIT noted, "[a] scope ruling by definition is a determination by Commerce that clarifies the scope of a standing antidumping or countervailing duty order." *Id.* (citing 19 C.F.R. § 351.225(a) (noting that when "issues arise as to whether a particular product is included within the scope

of an antidumping or countervailing duty order," Commerce issues scope rulings that "clarify the scope of an order" with respect to particular products)). Thus, a scope ruling does not merely "confirm" the scope of an antidumping duty order but instead clarifies the unclear scope of the order and whether the particular product at issue falls within that scope. As this court has long noted, only Commerce can interpret and clarify the scope of an antidumping duty order. *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) ("In issuing scope rulings, Commerce . . . enjoys substantial freedom to interpret and clarify its antidumping orders." (internal quotations omitted)).

Commerce also argues that its interpretation of § 351.225(l)(3) is appropriate because it prevents gamesmanship and delay. According to Commerce, importers could be encouraged "to delay their request for a scope ruling from Commerce, because if entries are only suspended prospectively, importers could import potentially in-scope product without paying duties." Appellant's Br. at 22. While we do not disagree with Commerce's argument, to be clear, we do not find that such gamesmanship occurred in this case. First, we note that Commerce always retains the authority to self-initiate a scope inquiry and, thus, is not bound by the timing of the importer's scope ruling request to determine whether a product is in scope. 19 C.F.R. § 351.225(b) ("If the Secretary determines from available information that an inquiry is warranted to determine whether a product is included within the scope of an antidumping or countervailing duty order . . . the Secretary will initiate an inquiry . . . ."). Second, in this case, there was no undue delay in requesting a scope ruling. Once US&F received CBP's Notice of Proposed Action and became aware that its products were potentially in scope, US&F timely filed its scope ruling with Commerce.

CONCLUSION

We hold that Commerce exceeded its regulatory authority under 19 C.F.R. § 351.225(l)(3) by retroactively suspending liquidation to the issuance date of the *ADD Order*. We also find that substantial evidence supports Commerce's final scope ruling that US&F's washers are within the scope of the *ADD Order*. For these reasons, we affirm.

**AFFIRMED**

COSTS

No costs.